James Thomas JEFFERSON,
Petitioner–Appellee,

v.

Jack MORGAN, Warden, Respondent–Appellant.

No. 91–5764.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 11, 1992.

Decided April 29, 1992.

Charles R. Ray (briefed), Bryan & Marett, Donald E. Dawson (argued), Ray & Housch, Nashville, Tenn., for petitioner-appellee.

Charles W. Burson, Atty. Gen., Debra K. Inglis, Asst. Atty. Gen. (argued and briefed), Nashville, for respondent-appellant.

Before: KEITH and MARTIN, Circuit Judges; and BELL, District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Jack Morgan, who is warden of the Tennessee State Penitentiary, appeals the judg-

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

ment of the district court granting James Thomas Jefferson a writ of habeas corpus under 28 U.S.C. § 2254. For the following reasons, we affirm.

On July 23, 1968, a Davidson County, Tennessee, grand jury indicted Jefferson, a black citizen, for first-degree murder, rape, and assault with intent to commit murder. The grand jury that indicted Jefferson contained two black members out of 13 total members. Prior to trial, Jefferson filed a plea in abatement alleging a systematic exclusion of blacks from grand and petit juries in Davidson County. Without the benefit of a hearing, the trial court denied Jefferson's plea after ruling there was no systematic exclusion of blacks from juries.

Jefferson's first trial ended when the trial court declared a mistrial because the petit jury, which was composed of seven whites and five blacks, was unable to reach a unanimous verdict. At his second trial, Jefferson again alleged that the county had systematically excluded blacks from grand and petit juries. The trial court overruled Jefferson's objection, and the jury, which was composed of ten whites and two blacks, convicted Jefferson. He was sentenced to 99 years in prison.

On appeal, the Tennessee Court of Criminal Appeals remanded the case to the trial court with instructions to conduct an evidentiary hearing on the issue of the systematic exclusion of blacks from juries. The Tennessee Supreme Court affirmed the remand order. On remand, the trial court limited Jefferson's proof of his claim to the composition of the particular grand jury that indicted him and to the particular petit jury that convicted him. The trial court subsequently held there was no systematic exclusion of blacks from either jury. In 1977, the Tennessee Court of Criminal Appeals affirmed the trial court's decision, 559 S.W.2d 649, and the Tennessee Supreme Court denied certiorari.

On April 1, 1982, Jefferson filed a petition for a writ of habeas corpus in federal district court. Jefferson requested the district court to quash his indictment and to vacate his conviction because Davidson County had systematically excluded blacks from grand and petit juries in violation of the Equal Protection Clause and the Sixth Amendment's fair-cross-section requirement. At an evidentiary hearing, Jefferson presented evidence that in the decade prior to his indictment, from 1958 through 1968, two criminal court judges selected grand jurors under a "key man" system. Under the "key man" system, the judges personally selected prospective grand jurors from the community at large. During this time period, the judges selected 33 grand juries, with each grand jury being composed of 13 members including one foreperson. Of the 33 grand juries, Jefferson established the racial composition of 26 grand juries. The proof showed that no more than 20 blacks served in the 338 positions available on the 26 grand juries. Consequently, the grand juries were, at most, 5.9% black. During this same time period, the population of Davidson County was approximately 18.5% black. The district court concluded the state had violated equal protection guarantees by systematically excluding blacks from grand juries including excluding blacks from the position of grand jury foreperson. The court granted Jefferson a writ of habeas corpus and ordered the state to re-indict Jefferson within 90 days or release him from custody.

On appeal, this court held that under *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), Jefferson had failed to exhaust available state remedies on the grand jury foreperson issue. We reversed the district court's judgment and ordered the district court to dismiss the petition without prejudice. On August 26, 1986, Jefferson filed a petition for post-conviction relief in the Criminal Court for Davidson County requesting the court to vacate his murder conviction because of racial discrimination in the selection of grand jury forepersons. After a hearing, the court rejected Jefferson's claim and dismissed his petition. The Tennessee Court of Criminal Appeals affirmed the trial court's judgment, and the Tennessee Supreme Court denied review.

On May 10, 1989, Jefferson filed this current action seeking a writ of habeas corpus. Jefferson alleged that Davidson County had systematically excluded blacks from grand juries and also from the position of grand jury foreperson in violation of the Equal Protection Clause. Pursuant to 28 U.S.C. § 636(b)(1)(B), the district court directed a magistrate judge to conduct a hearing and submit a report. In his report, the magistrate recommended that under the "law of the case" doctrine the court should reinstate its prior decision finding that Davidson County had systematically excluded blacks from grand juries. On May 20, 1991, the district court adopted the magistrate judge's Report and Recommendation, reinstated the court's earlier findings of fact and conclusions of law, and granted Jefferson a writ of habeas corpus. The court again ordered the state to reindict Jefferson within 90 days or release him from custody. The district court, however, stayed its order pending appeal.

On appeal, Morgan contends that the district court's decision is erroneous on three possible grounds. First, Morgan asserts that Jefferson failed to establish a prima facie case of racial discrimination in the selection of grand juries. Second, Morgan argues that he rebutted any prima facie case that Jefferson established. Finally, Morgan contends that even if Jefferson established a violation of equal protection, this court should not reverse Jefferson's conviction and dismiss the indictment.

█ Although there is no constitutional right to be indicted by a state grand jury, if a state chooses to use a grand jury, it must select members of the grand jury without discrimination based on race or color. *Aldridge v. Marshall*, 765 F.2d 63, 68 (6th Cir.1985), *cert. denied sub nom. Aldridge v. Morris*, 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986). The Supreme Court has long held that racial discrimination in the selection of a grand jury violates a defendant's equal protection rights. *See e.g., Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Cassell v. Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); *Strauder v. West Virginia*, 100

U.S. 303, 25 L.Ed. 664 (1879). In *Rose v. Mitchell*, 443 U.S. 545, 555–56, 99 S.Ct. 2993, 2999–3000, 61 L.Ed.2d 739 (1979), the Supreme Court summarized the harm resulting from excluding potential grand jurors because of their race:

> Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process. The exclusion from grand jury service of Negroes, or any group otherwise qualified to serve, impairs the confidence of the public in the administration of justice. As this Court repeatedly has emphasized, such discrimination 'not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.' *Smith v. Texas*, 311 U.S. 128, 130 [61 S.Ct. 164, 165, 85 L.Ed. 84] (1940) (footnote omitted). The harm is not only to the accused, indicted as he is by a jury from which a segment of the community has been excluded. It is to society as a whole.

█ In order to prove discrimination in the selection of grand jurors, a petitioner may show that the procedure employed by the state resulted in a substantial underrepresentation of his race or of the identifiable group to which he belongs. *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Specifically, to establish a prima facie case of discrimination, a petitioner must satisfy a three-part test. First, he must establish that the group excluded from the grand jury is one that is a recognizable, distinct class capable of being singled out for different treatment under the laws. *Id.* Second, he must establish that the selection procedure used by the state to select grand juries is susceptible to abuse or is not racially neutral. *Id.* Finally, he must establish the degree of underrepresentation occurring over a significant period of time by comparing the proportion of the excluded group in the total population to the propor-

tion serving as grand jurors. *Id.* Courts refer to this final part of the three-part test as the "rule of exclusion." The rationale behind the "rule of exclusion" is that if a disparity is sufficiently large over a significant period of time, then it is unlikely that the disparity is due solely to chance or to accident, and in the absence of evidence to the contrary, a court should conclude that racial or other class-related factors entered into the selection process. *Id.* at n. 14. Once the petitioner has established a prima facie case, the burden shifts to the state to rebut the inference of intentional discrimination. *Id.* at 495, 97 S.Ct. at 1280.

■ In this case, Jefferson has established a prima facie case of racial discrimination. First, there is no question that Jefferson, as a black citizen, is a member of a distinct class that is capable of being singled out for different treatment under the laws. *See Rose,* 443 U.S. at 565, 99 S.Ct. at 3005. Second, the "key man" system, which was the process used to select grand jurors during the time period in which Jefferson was indicted, was susceptible to abuse. *See id.* at 566, 99 S.Ct. at 3005; *Castaneda,* 430 U.S. at 497, 97 S.Ct. at 1281.

Finally, Jefferson has satisfied the "rule of exclusion." During the relevant time period, the state empanelled 33 grand juries. Jefferson and the state could not accurately establish the racial composition of several grand juries; however, the evidence demonstrated that on 26 grand juries no more than 20 blacks served in the 338 grand jury positions available. Thus, no more than 5.9% of the grand jurors were black. During the same period, the population of Davidson County was composed of approximately 18.5% blacks.

Morgan's assertions notwithstanding, comparing straight racial percentages is of little value to this court. In *Moultrie v. Martin,* 690 F.2d 1078 (4th Cir.1982), the Fourth Circuit nicely stated the rationale for not merely comparing straight racial percentages:

When a litigant seeks to prove his point exclusively through the use of statistics, he is borrowing from another discipline, mathematics, and applying these principles to the law. In borrowing from another discipline, a litigant cannot be selective in which principles are applied. He must employ a standard mathematical analysis. Any other requirement defies logic to the point of being unjust. Statisticians do not simply look at two statistics, such as the actual and expected percentage of blacks on a grand jury, and make a subjective conclusion that the statistics are significantly different.

*Id.* at 1082. We do recognize that the Court in *Castaneda* compared the percentage of Mexican–Americans with the percentage of Mexican–Americans in the relevant population. *See Castaneda,* 430 U.S. at 495–96, 97 S.Ct. at 1280–81. In an extensive footnote, however, the Court made reference to using standard deviation analysis as a means of predicting the significance of racial disparities. *See id.* at n. 17. *See also Ford v. Seabold,* 841 F.2d 677, 684 n. 5 (6th Cir.1988) (acknowledging the use of statistical decision theory in the context of equal protection claims, but rejecting its use in the context of a fair-cross-section claim). Standard deviation is a measure of the extent to which an observed result is likely to vary from an expected result. The larger the number of standard deviations an observed result is from an expected result, the lower the probability that the observed result is random. More specifically, in the context of racial discrimination claims, the larger the number of standard deviations, the more likely the observed result is the product of discrimination rather than chance.

Before applying standard deviation analysis, we need to determine how many blacks one would have expected Davidson County to select out of the 338 grand jury positions available. The formula for determining an expected result is: $n \times p$, where "n" is the sample size (here, the total number of grand jurors selected by the county, which is 338) and "p" is the proportion of items possessing the characteristic that is being investigated (here, the proportion of blacks in Davidson County, which is 0.185). Applying the formula to the statistics at

hand, we have determined that in the 26 grand juries empaneled by Davidson County, one would have expected the county to have selected approximately 63 black grand jurors. They, of course, selected 20 black grand jurors.

The formula for determining standard deviation is: $\sqrt{n \times p \times (1\text{-}p)}$. See W. Mendenhall, *Introduction to Probability and Statistics* 180 (6th ed. 1983). Using this formula, the standard deviation of the sample is 7.1 blacks. This means that a statistician would expect that if Davidson County had randomly selected the 338 grand jurors it would have selected approximately 63 +/− 7 blacks. The final step in our analysis is determining by how much the expected result (63 blacks) and the observed result (20 blacks) differ in terms of standard deviations. This difference is called the "z-score" or standard score, and its formula is: (observed result-expected result)/(standard deviation). See *id.* at 211. In this case, the data yields a difference of approximately −6 standard deviations.

We decline to decide at what point a court should conclude that the difference between the expected result and the observed result is significant enough to establish a prima facie case of discrimination. *See Castaneda,* 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17. ("As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.") In this case, however, we do hold that −6 standard deviations is sufficient to establish a prima facie case of racial discrimination. Given the racial composition of Davidson County, the odds that the county would have *randomly* selected only 20 blacks for the 338 grand jury positions are approximately 1,000,000,000 to 1. *See CRC Standard Probability and Statistics Tables and Formulae* 124 (William Breyer ed., 1991) Thus, the hypothesis that Davidson County drew grand jurors without regard to race is suspect. In sum, because Jefferson has satisfied all three parts of the *Castaneda* test, we hold that he has established a prima facie violation of the Equal Protection Clause.

Morgan asserts that Jefferson cannot establish a prima facie case because the particular grand jury that indicted Jefferson was 15.4% black and thus almost perfectly reflected the proportion of blacks in the eligible pool of grand jurors (18.5%). Morgan's assertion, however, is without merit. In *Alexander v. Louisiana,* 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972) (citation omitted), the Supreme Court stated:

> Although a defendant has no right to demand that members of his race be included on the grand jury that indicts him, he is entitled to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the administration of justice.

In other words, the Equal Protection Clause *does not* guarantee a black defendant seven, five, or even one black on any grand jury that indicts him. The clause *does not* guarantee a black defendant a grand jury that accurately reflects the racial composition of the community. The Equal Protection Clause *does* guarantee, however, that a state will not exclude *any* grand juror simply because he or she is black. Thus, the fact that the grand jury that indicted Jefferson contained two blacks does not defeat his equal protection claim.

■ Granted, as Morgan asserts, a petitioner may prove discrimination in ways other than by evidence of long-term underrepresentation. In *Batson v. Kentucky,* 476 U.S. 79, 95, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69 (1986), the Supreme Court noted that absent evidence of systematic, long-term underrepresentation, a petitioner could establish a prima facie case of an equal protection violation by demonstrating that (1) members of his race were substantially underrepresented on the venire from which his particular jury was drawn; and (2) the venire was selected under a practice providing an opportunity for discrimination. We, however, do not see *Batson* as standing for the proposition that Jefferson

is precluded from proving an equal protection violation simply because he had the "right number" of blacks on his grand jury; there is no "right number" of blacks on a grand jury. The long line of Supreme Court cases including *Castaneda* and *Batson* stand for the proposition that a petitioner can establish a prima facie case of racial discrimination in the selection of jurors by demonstrating *either* (1) underrepresentation of the petitioner's race on the particular grand jury that indicted the petitioner and a selection system that is subject to abuse; *or* (2) underrepresentation of the petitioner's race on numerous grand juries over a significant period of time. Either showing produces an inference that the state discriminated in selecting a petitioner's particular grand jury.

■ Next, Morgan argues that he rebutted any prima facie case that Jefferson established. The rebuttal evidence introduced by the state consisted of the testimony of Judge John Draper and Judge Raymond Leathers, the two criminal court judges who were primarily responsible for selecting grand jurors during the relevant time period. The judges denied that they excluded jurors on the basis of race. They testified that in order to recruit grand jurors they depended on first-hand knowledge and on recommendations from friends and civic groups. Both judges used supposedly objective guidelines to select grand jurors, including citizenship activities, maturity, work experience, and standing in the community. We believe the judges' testimony constitutes no more than affirmations of good faith, which are insufficient to rebut the prima facie case established by Jefferson. *See Alexander,* 405 U.S. at 632, 92 S.Ct. at 1226.

■ Finally, Morgan argues that even if Jefferson established an equal protection violation, the appropriate remedy is not for us to reverse Jefferson's conviction and dismiss the indictment. Morgan argues, in essence, that even if the grand jury that indicted Jefferson was selected in an unconstitutional manner, the violation was harmless in light of the fact that a trial jury has found Jefferson guilty beyond a reasonable doubt. In other words, Morgan appears to argue that Jefferson's subsequent conviction purged any taint attributable to an unconstitutional grand jury selection process. We, however, reject Morgan's argument. In rejecting an identical argument, the Supreme Court stated:

> Nor are we persuaded that discrimination in the grand jury has no effect on the fairness of the criminal trials that result from the grand jury's actions. The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense—all on the basis of the same facts.... Thus even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or the very existence of the proceedings to come.

*Vasquez v. Hillery,* 474 U.S. 254, 263, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986). *See also Rose,* 443 U.S. at 551, 99 S.Ct. at 2998 ("[W]here sufficient proof of discrimination in violation of the Fourteenth Amendment has been made out and not rebutted, this Court uniformly has required that the conviction be set aside and the indictment returned by the unconstitutionally constituted grand jury be quashed.").

Morgan's reliance on *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), and *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), is misplaced. *Bank of Nova Scotia,* 487 U.S. at 252, 108 S.Ct. at 2372, involved the dismissal of an indictment based on prosecutorial misconduct. The Supreme Court applied harmless-error analysis and held that the district court could not dismiss the indictment for errors in the grand jury proceedings unless the errors prejudiced the defen-

**1192**

dant. *Id.* at 254, 108 S.Ct. at 2373. The court cautioned, however, that cases like *Bank of Nova Scotia* were distinguishable from cases like *Vasquez* because the latter cases were "ones in which the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Bank of Nova Scotia,* 487 U.S. at 257, 108 S.Ct. at 2374. In *Mechanik,* the Fourth Circuit had reversed the defendants' convictions because two government witnesses had testified in tandem in front of the grand jury that indicted the defendants. 475 U.S. at 67, 106 S.Ct. at 940. The Supreme Court reversed the Fourth Circuit because "the petit jury's verdict of guilty beyond a reasonable doubt demonstrat[ed] a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted." *Id.* The Court, however, did not overrule *Vasquez;* it simply distinguished the case. *See id.* at 70 n. 1, 106 S.Ct. at 942 n. 1. Despite the Supreme Court's holdings in *Bank of Nova Scotia* and *Mechanik, Vasquez* remains good law.

In summary, we hold that Jefferson has established a prima facie case of an equal protection violation, and the state has failed to rebut the prima facie case. We therefore affirm the judgment of the district court and direct the State of Tennessee to re-indict Jefferson within 90 days or release him from custody.