**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

Chris Jermaine **ALLEN** (96–6635); Corey Antoine **Murray** (96–6676); Jason Edward **Webb** (96–6677); Jeffery Ramone **Buckley** (96–6679), Defendants–Appellants.

Nos. 96–6635, 96–6676, 96–6677 and 96–6679.

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1998.

Decided Nov. 19, 1998.

Scott T. Wendelsdorf (argued and briefed), Federal Public Defender's Office, Louisville, KY, William Yesowitch (argued and briefed), Frockt & Klingman, Louisville, KY, Steven R. Romines (argued), Lawrence I. Young (briefed), Romines, Weis & Young, Louisville, KY, for Appellants.

Terry M. Cushing (argued and briefed), Marisa J. Ford (briefed), Office of the U.S. Attorney, Louisville, KY, for Appellee.

Before: KRUPANSKY, NELSON, and BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

Defendants–Appellants Buckley, Murray, Webb, and Allen, along with co-defendants Johnson and Birdsong, were indicted for conspiracy to affect commerce by armed robbery and the substantive offense of affecting commerce by armed robbery (counts one and two), both in violation of 18 U.S.C.A. § 1951(a) (West 1984 & Supp.1998); for using and carrying a firearm during and in relation to a crime of violence made a crime under § 1951(a) (count three), in violation of 18 U.S.C.A. § 924(c) (West 1976 & Supp. 1998); and for interstate transportation of stolen merchandise (count four), in violation of 18 U.S.C.A. § 2314 (West 1970 & Supp. 1998). Murray moved to sever his trial from those of the other defendants, but the court denied his motion. Shortly before trial, Webb, Allen, Johnson, and Birdsong each pled guilty to all four counts without a plea agreement. A jury subsequently convicted Buckley and Murray on all counts.

For counts one, two, and four, the court assigned Allen and Webb a total offense level of eighteen; Buckley received a two-point reduction for acceptance of responsibility[1] and was assigned a total offense level of nineteen; Murray was assigned a total offense level of twenty-one. Each Appellant was sentenced accordingly within the applicable range. In addition, pursuant to 18 U.S.C.A. § 924(c), the district court added to each Appellants' sentence a mandatory consecutive sixty-month sentence for count three.

Buckley and Murray appeal their convictions, asserting improper jury selection. Murray also appeals the court's denial of his motion to sever. Webb, Allen, and Murray appeal the imposition of the sixty-month sentence for count three. For the reasons that follow, we AFFIRM the district court.[2]

## I.

The four Appellants, Johnson, and Birdsong, all African–American males from Indianapolis, Indiana, conspired to and did rob a LeRoy's Jewelry Store ("LeRoy's") in Louisville, Kentucky. Approximately two weeks prior to the robbery, Johnson and Birdsong had stolen a ring from the same store. On February 7, 1996, the defendants carried out their plan and robbed LeRoy's.

Prior to arriving at the store, the defendants discussed the fact that they would use a gun, and decided that Webb would be the one to carry it. When they reached the store, which was located in a shopping mall, the four Appellants entered LeRoy's. Johnson remained outside of the store to watch for security guards and police, and Birdsong remained in the van in the parking lot to aid the group in making a speedy escape. After Allen diverted the attention of one of the clerks by posing as a customer, Buckley reached over an unlocked display case and

---

1. The defendants were originally held and charged in Indiana, but were subsequently returned to Jefferson County, Kentucky, where they were indicted and charged. While en route from Indiana to Jefferson County, Buckley requested and was permitted to write out a statement wherein he confessed.

2. Appellant Buckley also argues that the district court erroneously refused to grant him a two-point acceptance-of-responsibility reduction. We recognize that Buckley's current counsel did not represent Buckley during his trial proceedings; still, if counsel had read the record, he would know that the court in fact *granted* the reduction and adjusted the base level from the level 21 recommended by the Presentence Report to a level 19. On page 689 of the Joint Appendix, the court clearly states:

I believe that [Buckley's] statement at this time, even if it omitted certain things, represents a substantial statement of his involvement in the case and acknowledgment of what he did and a substantial admission of guilt sufficient to allow for a two point reduction. Therefore, I'll find the offense level 19 and the criminal history category III.

The government unequivocally stated that it objected to the reduction, to which the court responded "I understand," and proceeded to apply the reduction. The judgment reflects that the court in fact sentenced Buckley at a level 19. Counsel has not argued that Buckley should have received a three rather than a two point reduction.

slammed open its door. Webb pulled out a .38 caliber revolver, and Murray, Webb, and Buckley grabbed jewelry from the display case while Allen left the store. The five defendants left the mall and jumped into the waiting van, which headed toward Indianapolis.

Two shoppers in the parking lot witnessed the getaway and reported to the police a partial license plate number and description of the van. Based on this information, the Indiana State Police stopped the van, arrested the six defendants, and recovered the gun and most of the stolen jewelry.

Murray and Buckley were tried together in September 1996. Immediately prior to the jury venire panel entering the courtroom, counsel for Buckley and Murray moved to disqualify the panel because it consisted of 39 Caucasians, 1 American–Indian, and no African–Americans.[3] The court noted the objection, and stated that although it would move forward as planned, during a break, it would ask the jury administrator to come to the courtroom and testify as to how she assembled the panel. A jury was seated and the case was presented.

Prior to submitting the case to the jury, and out of the jury's presence, the court and the parties questioned Sharon Palmer, the jury administrator for the Western District of Kentucky, about the selection process. Ms. Palmer testified that once every four years, the Western District creates a "master wheel" of potential jurors for each geographical "jury division" within the Western District. To accomplish this, the District sends a letter to the Secretary of State of the Commonwealth of Kentucky, instructing that office to create a list for each division by selecting every x-numbered person on the voter registration lists from the counties within the different divisions. *See also* PLAN OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY FOR THE RANDOM SELECTION OF GRAND AND PETIT JURORS, As Amended ("JURY PLAN"), sec. III–V (approved April 15, 1993, Judge Merritt, 6th Circuit). All of the names selected for the relevant division, in this case, the Louis-

ville Division, are then put into the master wheel.[4] When new persons are needed for the jury pool, the jury administrator directs a court employee to select at random a certain number of names from the master wheel. Juror qualification forms are forwarded to those selected, and upon return-receipt, the names of those people who are not statutorily disqualified are put into a "small wheel" (the "qualified jury wheel"). *See* JURY PLAN, V–VI.

When Ms. Palmer needs to empanel a jury or juries, she directs someone to draw at random from the small wheel a specified number of names. She issues summonses to the selected persons and assigns them an initial reporting date. Those summoned constitute the jury pool from which she randomly selects panels for the day's trials. Although eventually she has access to jury questionnaires, which include on the backside a check-box for race, Ms. Palmer testified that she has no racial information at the time she issues summonses or selects panels.

Ms. Palmer generally requests that those not chosen from the pool for a panel and those not chosen from a panel for a jury come back on a particular date· for which another trial has been scheduled. In addition, if she has selected a panel, or a jury has been selected, for a particular trial and that trial is canceled, Ms. Palmer calls those persons to assign them a new reporting date. Frequently, she will assign the entire panel from a canceled trial to another trial. Persons summoned normally serve for 90 days, although during the time in question, some served an additional 30 days due to the proximity of the next master wheel selection.

The jury pool for the September trial consisted of approximately 250–300 people summoned for jury service since the preceding April. Some of those people were African–American. In the case at bar, the panel used had been randomly selected for an August trial that was subsequently canceled. Ms. Palmer needed more jurors for this case than had been on that panel, so she added people who had been summoned and assigned to

---

3. The juror list named 40 prospective jurors, but apparently only 38 appeared, 37 of whom were Caucasian.

4. The master wheel contains 65,000–75,000 names.

other recently-used panels, but who had not been seated on a jury and whose names would otherwise have been thrown back in the wheel for re-summoning. According to the judge, it is common practice to add stricken jurors from a prior panel to complete a different venire panel so that fewer jurors need be summoned overall.

During Ms. Palmer's testimony, the court stated that this was the first time he had ever seen a panel so devoid of minorities, and that in his estimation, the percentage of African–Americans in Jefferson County was about 12 percent, and somewhat less in the Western District of Kentucky in the Louisville Division. The court also opined that the voter registration percentage might be a percentage or so less.

After hearing argument on the matter, the court found that the process used produced a random and fair jury sample, both in general and in this particular case, and that people were not being added to or excluded from a panel because of their race. The court therefore overruled Appellants' objection to the jury composition, but noted that it was preserved for appeal.

The jury convicted both Buckley and Murray on all four counts. Murray filed a motion for a new trial, arguing, among other things, that the jury had been improperly selected and that the overwhelming evidence against Buckley prejudicially spilled over into the jury's consideration of Murray's culpability. The trial court denied this motion.

## II.

■ Appellants Buckley and Murray argue that the selection of their jury was not "random" and resulted in an all-white jury venire, in violation of the Jury Selection and Service Act ("JSSA"), 28 U.S.C.A. § 1861 *et seq.* (West 1994), the Sixth Amendment, and the equal protection component of the Fifth Amendment. Whether a defendant has been denied his right to a jury selected from a fair cross-section of the community is a mixed question of law and fact, which we review *de novo. United States v. Miller,* 771 F.2d 1219, 1227 (9th Cir.1985); *see also United States v. Grisham,* 63 F.3d 1074, 1077 (11th Cir.1995) (constitutional challenges to jury selection process reviewed *de novo* ); *Polk v.*

*Hunt,* 76 F.3d 379, 1996 WL 47110, at *1 (6th Cir.1996) (unpublished).

### A. JSSA

The JSSA requires district courts to devise a plan ensuring random selection of jurors from a fair cross-section of the community. 28 U.S.C.A. §§ 1861, 1863. Appellants argue that Ms. Palmer's testimony demonstrates that the selection process in this case contravened the JSSA because it was not "random," selection was not from a fair cross-section of the community, and it did not comply with the district court jury selection plan. Defendants apparently do not challenge the use of the venire panel randomly selected for a different trial. Instead, they argue that the jury administrator impermissibly re-assigned jurors stricken from other panels to defendants' panel without first putting their names back into the small wheel and subjecting them to another random draw.

As initial matter, we note that Ms. Palmer never said that she did not comply with the local selection plan. As she made very clear, the local jury selection manual primarily describes the process for filling the master wheel, and generally states that the selection of names for the smaller wheel should be "random." The manual does not detail how to select a particular panel for a particular trial. It states in part:

> *From time to time* ... the Clerk shall publicly draw from the respective jury division qualified jury wheel such number of names of persons as directed by the court for service as grand or petit jurors *for that respective jury division.*
>
> The Clerk shall issue a jury summons for each person so drawn....

JURY PLAN, sec. VIII (emphasis added).

The process described by Ms. Palmer does not conflict with the manual's provisions. Contrary to Defendants' assertion, there is no rule requiring that the administrator redraw names from the qualified wheel each time she needs to fill a particular jury venire. The rule says that jurors are drawn for the "jury division"; once their names have been drawn and they have been summoned, jurors are at the service of the court; not a particu-

lar trial or judge. Further, Ms. Palmer stated that she "was never told that she could not" re-use jurors from other panels and that she had followed the district's past practice of adding surplus jurors from one panel to a new panel rather than summoning additional jurors. The court confirmed that this was the practice used in the Western District of Kentucky. Thus, as a factual matter, Defendants' contention that the clerk deviated from normal procedure is simply incorrect.

■ Appellants claim that the re-use of jurors without re-summoning them violates the random-selection requirements of the JSSA, and that this non-random selection practice resulted in an underrepresentation of African–American jurors on their jury, which is a violation of the fair cross-section requirements of the JSSA. To prove a violation of the JSSA, a defendant must show that the district's jury selection plan fails to comply substantially with the Act. 28 U.S.C. § 1867(a). In considering the JSSA requirements, the First Circuit has stated:

A substantial failure is one that contravenes one of the two basic principles of the Act: (1) random selection of jurors, and (2) determination of juror disqualification, excuses, exemptions, and exclusions on the basis of objective criteria. Technical violations, or even a number of them, that do not frustrate the random selection and cross section requirements and do not result in discrimination and arbitrariness do not constitute a substantial failure to comply.

... [T]he test for showing a substantial failure to comply with the random-selection and cross-section requirements of the Act [is as follows]:

In order to demonstrate a violation of the statutory "fair cross section" standard, a defendant must show that a "distinctive" group, that is, a "cognizable" group, was excluded from the jury selection process; that such group was "systematically excluded"; and that because of such exclusion the jury pool failed to be "reasonably representative" of the community.

*United States v. Savides*, 787 F.2d 751, 754 (1st Cir.1986) (internal citations omitted). This test is essentially identical to the *Duren v. Missouri* test used in the Sixth Amendment fair-cross-section analysis (discussed below), and we adopt it as our own. We will address the defendants' JSSA and Sixth Amendment fair-cross-section claims together. We will address first, however, the defendants' claim that the jury selection process to which they object substantially fails to comply with the random-selection requirements of the JSSA.

■ Appellants argue that there is a distinct randomness requirement for each and every step of the selection process, and that adding to a particular panel jurors who have been stricken from another panel, without returning their names to the wheel and re-summoning them, violates this requirement. In effect, Appellants argue that a court may not build up a jury pool, but instead must summon fresh jurors for each and every trial. This argument reveals a fundamental misunderstanding of the process. Section 1866(c) of the JSSA specifically allows persons excluded from a particular jury to sit on another jury; thus, there is no *per se* problem with re-using potential jurors. *See* 28 U.S.C.A. § 1866(c).

In *United States v. Resto*, 824 F.2d 210 (2d Cir.1987), the juries for two different narcotics cases were selected at the same time, from the same venire panel. Fifty people were *voir dired*, and a jury was selected for the first case. A panel of twenty-nine prospective jurors remained, seventeen of whom had been peremptorily challenged by either the first defendant or the prosecutor. The second jury was chosen from those remaining. *Id.* at 212–13. The Second Circuit held that this system met the JSSA randomness requirement, noting that there was no dispute that the original venire of fifty was fairly drawn. *Id.* at 214.

In the present case, prior to assignment to any particular venire, a potential juror has been randomly selected three times: first, in being pulled from the voter registration list, second, in being pulled from the master wheel, and third, in being pulled from the small wheel. Once they have been summoned, they become part of the pool, which is at the service of the jury division, and another random process is used to assign them to a particular venire. As in *Resto*, there is no contention that these jurors were

not fairly drawn for their original panels. In the present case, if a prospective juror is not chosen, he or she remains in the jury pool and is assigned a new date to appear and be assigned to a different venire. This procedure is similar to that which passed muster in *Resto*—the only difference here· is that instead of being assigned to a specific second panel on the same day, the stricken jurors are assigned to a specific second panel at a date in the future. Because the JSSA specifically permits re-use of potential jurors, and because these jurors were randomly selected several times over, we conclude that the district court correctly held that the jury selection plan did not substantially fail to comply with the random selection requirements of the JSSA.

### B. The Sixth Amendment "Fair Cross-section" Requirement.

Appellants argue that the "fair cross-section" requirements of both the JSSA and the Sixth Amendment entitled them to a venire panel that contained at least some African–Americans unless the government demonstrated that the under-representation was not due to a systematic exclusion of African–Americans in the jury selection process.

██ The Sixth Amendment requires that the jury venire from which a jury is selected represent a "fair cross-section" of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 696–97, 42 L.Ed.2d 690 (1975). In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court held that a defendant may establish a *prima facie* fair crosssection violation by showing

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is

due to systematic exclusion of the group in the jury-selection process.
*Id.* at 364, 99 S.Ct. at 668. The government may rebut this *prima facie* case by showing that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process ... that result in the disproportionate exclusion of a distinctive group. *Id.* at 367–68, 99 S.Ct. at 670.

██ Appellants have satisfied the first prong the *Duren* test, but they have not satisfied the other two. *Duren* and its progeny make crystal clear that a defendant's *prima facie* case includes all three elements listed above, and each must be established before the government is required to justify an infringing selection procedure. *See Duren*, 439 U.S. at 367–69, 99 S.Ct. at 670–71; *Ford v. Seabold*, 841 F.2d 677, 681 (6th Cir. 1988).

██ Appellants have not established *Duren*'s second prong, *i.e.*, that the representation of African–Americans in venires from which juries were selected is not fair and reasonable in relation to their population percentage. Both Murray and Buckley have conveniently misquoted the *Duren* test and argue that because their particular jury panel contained no African–Americans, they have met their burden of proof.· Appellants, however, must show more than that their particular panel was unrepresentative. *Duren* states that we look at the "venires" from which "juries" are selected, *id.* at 364, 99 S.Ct. at 668, and it has long been the case that defendants are not entitled to a jury of any particular composition—only to a panel from which distinctive groups were not "systematically excluded." *Taylor*, 419 U.S. at 538, 95 S.Ct. at 702.[5]

Appellants instead rely solely upon the court's statement that African–Americans constitute approximately 12% of the community. The evidence of record, however, weighs decidedly in favor of the government. Ms. Palmer testified that there were Afri-

---

5. *Duren* itself looked at the make-up of the weekly venires over several months time in determining whether the second prong was met. *Duren*, 439 U.S. at 362–63, 365–66, 99 S.Ct. at 667–68, 669; *see also Cunningham v. Zant*, 928 F.2d 1006, 1013 (11th Cir.1991) (no systematic discrimination where no evidence that voter list from which jury pools were selected was tam-

pered with in any way and no evidence that jury pools selected in accordance with plan regularly or consistently contained a significant underrepresentation of any group); *Ford*, 841 F.2d at 683–84 & n. 4 (noting that court must look at the overall period of time during which venires were chosen, and comparing jury *pool* and relevant population percentage).

can–Americans in the jury pool from which this particular *venire* panel was chosen. The judge stated that this was the first time he had ever seen a panel without any blacks on it. Out of a 250–300 person pool, it is not at all implausible that none of the 40 persons selected were black: statistically, only 30–36 members of the total pool would be black. Appellants have made no attempt to show that the number of blacks on previous panels or in the April to September pool did not substantially reflect their population percentage in the community. Thus, Appellants have not met their burden.

Furthermore, Appellants have completely failed to make any showing whatever of systematic exclusion, and therefore also have not satisfied the third prong of their burden. Appellants must show that the underrepresentation is inherent in the jury selection process used. *Ford*, 841 F.2d at 685.[6] Appellants have done nothing more than assert that completing a panel with persons stricken from other panels systematically excludes blacks. They have neither

asserted nor provided even a shred of evidence indicating that only whites are reassigned, while blacks are thrown back into the small wheel. Obviously, more than a general assertion is required to satisfy the element of systematic exclusion. The district court did not err in holding that the jury selection procedures did not violate the fair cross-section requirements of the JSSA or the Sixth Amendment.

## C. Equal Protection.

Finally, Appellant Buckley challenges the jury selection method on equal protection grounds, arguing that it "provided an opportunity for" discrimination. A defendant challenging a venire on equal protection grounds bears the burden of showing that the venire was selected in an intentionally discriminatory manner. *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir.1991), the Eleventh Circuit harmonized the Supreme Court precedent in this area[7] by holding that a defendant may

6. For example, in *Duren*, a state statute provided women with an exemption from jury service. Although chosen from the voter registration lists, women could expressly elect, either in their jury questionnaires or in response to a summons, not to serve. A similar option was offered to men if and only if they were over 65 years of age. In addition, if they failed to appear when summoned, women were presumed to have elected not to appear. This system resulted in weekly venires comprising 14.5% women, despite their constituting 54% of the population. 439 U.S. at 362–63, 99 S.Ct. at 667–68. In finding systematic discrimination, the Court observed that the evidence showed that the large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year. The Court also stated that the point in the selection process at which the systematic exclusion took place was readily apparent. *Id.* at 366–67, 99 S.Ct. at 669–70; *see also Ford*, 841 F.2d at 685 & n. 6 (rejecting claim of systematic underrepresentation where defendant provided only two samples showing that the population of women was 53% while the jury pool consisted of 31.3 and 34.3%; continuing confirmation necessary).

7. In *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Supreme Court held that a defendant can establish a *prima facie* case of discriminatory jury-venire selection if he shows "that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Id.* at 494, 97 S.Ct. at 1280. To make such a show-

ing, the *Castaneda* Court set forth the following requirements and observations: a defendant must (1) establish that the group is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied; and (2) prove the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve as jurors, over a significant period of time (the "rule of exclusion"). *Id.* A selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. *Id.* Upon such a showing, the burden shifts to the State to dispel the inference of intentional discrimination. *Id.* at 495, 497–98, 97 S.Ct. at 1280, 1282.

Subsequent to *Castaneda*, the Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson*, the Court rejected a requirement that a defendant need prove repeated peremptory striking of blacks over a number of cases to establish a *prima facie* equal protection violation; the Court reviewed several previous cases and found it clear that a historical/systematic showing, while sufficient, is not necessary to prove purposeful discrimination. The Court reiterated that the defendant still carries the burden of showing that the particular venire selection procedure used is purposefully discriminatory. *Id.* at 93, 106 S.Ct. at 1721. A defendant may make such a *prima facie* showing, however, by establishing that members of the defendant's race were substantially underrepresented on the venire from which his jury was drawn, and that the venire was

establish a *prima facie* case of such discrimination by making one of two showings: (1) that the defendant's race was substantially underrepresented on the particular venire from which the defendant's jury was selected AND that the venire was selected under a practice providing an opportunity for discrimination; or (2) that there has been systematic, long-term underrepresentation of defendant's race on jury venires. *Id.* at 1013–14 & n. 9. This circuit has recognized this dual set of tests in the context of alleged exclusion of minorities from grand juries, *see Jefferson v. Morgan,* 962 F.2d 1185, 1191 (6th Cir.1992), and we now explicitly apply it to the jury venire context.

Appellant argues that he has made a *prima facie* showing of discrimination because there were no African–Americans on the forty-person venire, yet, according to the district court judge, blacks comprise approximately 12% of the relevant population. He argues that using only struck jurors from other trials to comprise the jury venire for his trial provided an opportunity for discrimination because those persons may have been struck as the result of discriminatory peremptory challenges, and that "[r]egardless of the specific reason, such a selection process is ripe for discrimination."

Appellant has failed to establish his *prima facie* case. Applying the second test, Appellant presents no evidence that the practice of using stricken jurors has, over the long term, resulted in underrepresentation of minorities. Thus, he is relegated to the first test and must show both "substantial underrepresentation" in his own venire and the opportunity to discriminate.

Appellant has failed to show "substantial underrepresentation." In *United States v. Contreras,* 108 F.3d 1255 (10th Cir.1997), after randomly selecting a jury panel of 250, the district court *sua sponte* excused 132 jurors and ultimately directed only 115 to report for jury service. The defendant claimed that Hispanics were underrepresented on the panel, but failed to provide evidence of the relevant population. The Tenth Circuit found that the defendant's failure to

present evidence prevented her from establishing an equal protection claim because without such evidence, "there is simply no means by which this court can determine whether Hispanics were substantially underrepresented on the jury panel." *Id.* at 1269. Along similar lines, in *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the Supreme Court held that it could not say that the complete absence of black jury foremen was a statistically significant underrepresentation, despite the fact that the relevant population was 30 + % black, where there had been no showing of the total number of foremen appointed. *Id.* at 571, 99 S.Ct. at 3007–08.

In the present case, Appellant has failed to present any evidence of the relevant population percentage, instead relying solely on the court's estimates. Even if the court's 10–12% estimate is inaccurate, 0% is almost certainly less than the population percentage of blacks in the relevant community; nonetheless, without any evidence, we cannot say with any certainty whether it is "substantially less," or whether the underrepresentation in this case is statistically significant. *Cf. Castaneda,* 430 U.S. at 494 n. 13, 97 S.Ct. at 1280 n. 13 (if disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process); *Jefferson,* 962 F.2d at 1189 (applying statistical analysis to determine how many blacks one would expect to have filled available grand jury positions and then determining number of standard deviations between actual and expected). Appellant has not carried his burden of proof in this matter.

Even assuming that Appellant had adequately established underrepresentation, he has not shown that the practice of adding stricken jurors to complete venires provides a significant opportunity to discriminate. To begin with, we note that Appellant is simply wrong when he says that "only struck jurors" were used in his venire. And Appel-

---

selected under a practice providing the opportunity for discrimination. *Id.* at 94–95, 106 S.Ct. at 1721–22 (citing *Castaneda, Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599

(1967), *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), and *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)).

lant's contention that the re-use of persons who were the subject of discriminatory peremptory strikes provides an opportunity to discriminate makes no sense. If these jurors were in fact stricken because of their race, and reassigned to a new reporting date, there is a greater, rather than lesser chance, of having minorities on the next venire panel. If Appellant has any argument, it would seem to be that the jury administrator could choose whether to reassign a struck juror or to put his or her name back into the small wheel. However, despite ample opportunity to question Ms. Palmer, Appellant never sought to establish whether she had such discretion or to elicit specific facts concerning the reassignment process.[8] In fact, the testimony elicited showed that Ms. Palmer generally requested that all surplus jurors return on a new day, and that she is not aware of the race of those whom she reassigns to a new day because she works from cards that contain only names, addresses and zip codes. *Cf. Contreras,* 108 F.3d at 1269 (no opportunity for discrimination where ethnicity not indicated on jury questionnaires and judge selecting panel testified he did not pay attention to the last names of the jurors he excluded). Thus, although it is hypothetically possible that this process *could* provide an opportunity to discriminate, *i.e.,* if the jury administrator had discretion and knowledge of the race of each struck juror, Defendant has failed to provide any evidence that the process did in fact provide that opportunity, and thus has not carried his burden.

### III.

Appellant Murray made a pre-trial motion for severance, alleging a confrontation and Fifth Amendment problem arising from the confessions of his co-defendants. The court denied this motion, finding that the statements could be redacted in a way to prevent an inference of prejudice. Prior to trial, the United States provided notice of its intent to use the evidence of the previous robbery at LeRoy's against co-defendants Birdsong and Johnson. Murray requested reconsideration of the court's severance ruling, but the issue was rendered moot when Birdsong and Johnson changed their pleas to guilty and did not proceed to trial. Murray now argues that the trial court abused its discretion in denying his motion for severance because (1) the evidence against Buckley, in conjunction with his association with Murray, prejudicially "spilled over" into the jury's determination of Murray's guilt; and (2) Murray and Buckley presented irreconcilable "antagonistic defenses," *i.e.,* Murray claimed that he was an innocent bystander whose traveling companions decided to rob a jewelry store, while Buckley claimed that he did not plan the crime or have knowledge of the gun, but did in fact take jewelry with no intent to pay.

■ Murray has failed to preserve the issue of severance for appeal. Putting aside the fact that the reasons for severance Murray gave below are different from his arguments raised on appeal, in *United States v. Hudson,* 53 F.3d 744 (6th Cir.1995), we unequivocally stated that failure to renew a motion to sever at the close of evidence results in waiver of the motion:

> [T]his panel is barred from ruling on the merits of appellants' claim. As of January 1, 1987, a motion to sever counts or co-defendants is deemed waived if it is not renewed at the end of the evidence. *United States v. Swift,* 809 F.2d 320 (6th Cir. 1987). This procedure allows the trial court to assess whether joinder was in fact prejudicial, and prevents a defendant from deliberately failing to make a meritorious motion to wait and see what verdict the jury returns. *United States v. Terry,* 911 F.2d 272 (9th Cir.1990). Because appellants did not renew their severance motion, they are procedurally foreclosed from presenting it to this Court.

*Id.* at 747.

■ Murray claims to have preserved this issue by filing a post-trial motion for a new trial in which he asserted that Buckley's admission of involvement in the crime and the guilty pleas of the other four co-defen-

---

8. Even assuming she has discretion, the system utilized by the Western District is a far cry from the highly subjective "key-man" system, where judges or jury commissioners personally select prospective jurors from the community at large, which courts have found to be susceptible to abuse. *See Castaneda,* 430 U.S. at 484, 497, 97 S.Ct. at 1275, 1281–82; *Jefferson,* 962 F.2d at 1187, 1189. In this case, Ms. Palmer's choices are limited to persons who have been through at least four previous random selections and who have thereafter been struck from a panel.

dants created an inference that Murray was likewise involved in the crime ("spillover"). Murray has failed to provide, and we cannot find, any case law supporting this contention. Allowing a post-trial motion to preserve this issue would thwart the rationale behind requiring the renewal in the first place, *i.e.*, to foreclose the possibility that defendants will wait to make a meritorious motion until after the jury has rendered a verdict. Thus, we find that Murray has waived any right to appeal this issue and do not consider the merits of his contention.[9]

## IV.

■ Finally, we must decide whether the sentencing mechanism created by the *dual operation* of § 924(c)(1)'s mandatory sentencing requirement and the sentencing provisions of UNITED STATES SENTENCING COMMISSION, *Guidelines Manual,* ("USSG") § 2B3.1 (Nov.1995), constitutes an unconstitutional delegation to the Executive Branch of Congress's exclusive power to fix criminal sentences. The parties agree that because a gun was involved, § 1951(a)[10] and § 924(c)[11] both apply to this case and both prohibit armed robbery of a business engaged in interstate commerce. If the prosecutor had proceeded only under § 1951(a), USSG § 2B3.1 would have applied and, in this case, increased the Appellants' total offense level by five levels for use of a firearm in conjunction with the robbery. USSG § 2B3.1(b)(2).[12] In Webb's case, his sentencing range would have been 70–87 months (a 29–46 month increase in his 41–51 month range for counts one, two, and four). In Allen's case, his sentencing range would have been 57–71 months (a 24–38 month increase in his 33–41 month range for counts one, two, and four).[13] *See* USSG Ch. 5 Pt. A (sentencing table). However, because the prosecutor proceeded under both § 1951(a) and § 924(c), *i.e.*, by adding count three to the indictment as a separate charge, the USSG § 2B3.1 enhancement did not apply. USSG § 2K2.4, comment. (n.2).[14] Instead, because

---

**9.** This is not a situation where it would have been futile to renew the motion at the close of evidence. *See United States v. Brown,* 870 F.2d 1354, 1360 (7th Cir.1989) (citing *United States v. Kaplan,* 554 F.2d 958, 965 (9th Cir.1977), where the court clearly informed the defendant that any attempt to seek severance would be "useless."). Murray's post-trial motion was based in part on a ground (spillover) entirely different from his pre-trial severance motion (inculpatory confessions of co-defendants). At the close of evidence, the court had yet to consider the spillover contention, despite the fact that it would now be in the position to do so. *See United States v. Monks,* 774 F.2d 945, 949 (9th Cir.1985) (failure to renew severance motion based on "spillover" at the close of evidence results in waiver; "failure to do so at least suggests that the prejudice now asserted to have resulted from the joinder may not have seemed so substantial to appellant in the context of trial ....") (quoting *Williamson v. United States,* 310 F.2d 192, 197 (9th Cir.1962)).

**10.** Section 1951(a) provides:
Whoever in any way or degree obstructs, delays, or affects commerce ... by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both. 18 U.S.C. § 1951(a) (West 1984 & Supp.1998).

**11.** Section 924(c) provides in part:
Whoever, during and in relation to any crime of violence ... (including a crime of violence

... which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence ... be sentenced to imprisonment for five years.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence ... in which the firearm was used or carried."
18 U.S.C. § 924(c)(1) (West 1976 & Supp. 1998).

**12.** If a firearm is actually discharged or otherwise "used," a larger enhancement applies. If a dangerous weapon other than a firearm is used, the enhancement is smaller. USSG § 2B3.1(b)(2).

**13.** Because Murray failed to raise this issue below, he has waived it. *See United States v. Cullens,* 67 F.3d 123, 124 (6th Cir.1995).

**14.** Section 2K2.4 provides in part: If the defendant, whether or not convicted of another crime, was convicted under 18 U.S.C. § 844(h), § 924(c), or § 929(a), the term of imprisonment is that required by statute." USSG § 2K2.4(a). Application note 2 provides: "Where a sentence

of the prosecutor's charging decision, § 924(c)'s mandatory consecutive 60 month sentence applied. In Webb's case, this resulted in a total sentencing range of 101–111 months, and in Allen's case, 93–101 months. In short, the prosecutor's ability to add a § 924(c) charge to an indictment for armed robbery enables him to seek a different sentence-length for two identical § 1951(a) armed robbery cases, with identical facts and involving individuals with identical backgrounds. Appellants assert that this is unconstitutional.

We review *de novo* an appellant's challenge to his sentence on constitutional grounds. *United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir.1993). Appellants' attempt to end-run the doctrine of prosecutorial discretion is controlled by *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). Like the present case, *Batchelder* involved a prosecutor's decision to charge a defendant under a statute that authorized a higher maximum imprisonment term than another statute that, in the context of that case, prohibited identical conduct.[15] After discussing potential due process and equal protection considerations, the Court held that Congress's authorization of two different penalties for identical conduct did not constitute an impermissible delegation, stating:

> The provisions at issue plainly demarcate the range of penalties that prosecutors and judges may seek and impose. In light of that specificity, the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing the criminal laws. Having informed the courts, prosecutors, and defendants of the permissible punishment alternatives available ... Congress has fulfilled its duty.

*Id.* at 126, 99 S.Ct. at 2205. In enacting both §§ 924(c) and 1951(a), which, in the context of this case carry different penalties for identical conduct, Congress has merely provided prosecutors with two different avenues for bringing a criminal charge for committing armed robbery. Congress has "plainly demarcated the range of penalties": for 924(c), within the statute itself; for 1951(a) alone, through a sentencing enhancement set out by the Sentencing Commission. The "authority" to choose between the two "is no broader than the authority [prosecutors] routinely exercise" when deciding whether to prosecute and what charge to file or bring. Thus, there is no delegation problem. Appellants' attempts to distinguish *Batchelder* are without merit.[16]

under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm (*e.g.*, § 2B3.1(b)(2)(A)-(F) (Robbery)) is not to be applied in respect to the guideline for the underlying offense."

15. In *Batchelder*, the defendant was convicted for being a felon who received firearms. Although the defendant could have been charged under 18 U.S.C. § 1202(a), which prohibits such conduct and carried with it a two year maximum sentence and $10,000 maximum fine, the prosecutor chose to indict him under 18 U.S.C. § 922(h), which carries a five year maximum sentence and $5,000 maximum fine, pursuant to § 924(a). 442 U.S. at 116, 118–19, 99 S.Ct. at 2200, 2201–02.

16. Citing language from *Touby v. United States*, 500 U.S. 160, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991), Appellants also argue that Congress has impermissibly delegated legislative responsibility because it has failed to provide an "intelligible principle" and specific factors limiting the Executive Branch's discretion in deciding whether or not to apply the Sentencing Guidelines. Appellants' reliance on *Touby* is misplaced. In *Touby*, Congress delegated to the Attorney General the power temporarily to add new drugs to five schedules of controlled substances that are covered by federal criminal law. In other words, Congress gave to the Attorney General the power to *define* criminal conduct. *Id.* at 165–67, 111 S.Ct. at 1756–57. The Court found that because Congress designated specific factors for the Attorney General to consider in making scheduling determinations, it did not violate the nondelegation doctrine. *Id.* at 167, 111 S.Ct. at 1757. Similarly, *United States v. Mistretta*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), a nondelegation doctrine challenge to the creation and use of the United States Sentencing Commission, also involved the delegation of *legislative* authority to another Branch to *define* punishment ranges for criminal conduct.

Unlike *Touby* and *Mistretta*, this case does not involve a delegation of legislative authority; thus, the "intelligible principle" language contained therein is not relevant to the present case. Congress has specifically determined the conduct constituting a crime, and has set out definitive sentences.

## CONCLUSION

Accordingly, we AFFIRM the rulings of the district court in all respects.