**UNITED STATES of America**

v.

**Edwin EDWARDS, et al.**

**No. 98–165–B–M2.**

United States District Court,
M.D. Louisiana.

Oct. 26, 1999.

---

21. Rec.Doc. No. 431, p 10.

Michael S. Fawer, Covington, LA, for Edwin Edwards.

Edwin Edwards, Baton Rouge, LA, pro se.

Karl J. Koch, Lewis O. Unglesby, Unglesby & Koch, Baton Rouge, LA, for Stephen Edwards.

Stephen Edwards, Baton Rouge, LA, pro se.

Rebecca L. Hudsmith, Federal Public Defenders Office, Lafayette, LA, for Cecil Brown.

Servando C. Garcia, III, Ryan J. Roemershauser, Garcia & Bishop, Metairie, LA, for Andrew Martin.

Patrick Fanning, New Orleans, LA, for Bobby Johnson.

Mary Olive Pierson, Cooper & Pierson, Baton Rouge, LA, Camille F. Gravel, Jr., Alexandria, LA, for Gregory Tarver.

Kenneth Craig Smith, Jr., Smith & John, Shreveport, LA, for Ecotry Fuller.

James B. Letten, Peter G. Strasser, Department of Justice, U.S. Attorney's Office, New Orleans, LA, Michael William Magner, United States Attorney's Office, New Orleans, LA, Thomas L. Watson, Eddie J. Jordan, Jr., Stephen A. Higginson, United States Attorney's Office, New Orleans, LA, for U.S.

**RULING ON DEFENDANTS' MOTIONS TO DISMISS THE ORIGINAL AND SUPERSEDING INDICTMENTS**

POLOZOLA, Chief Judge.

Contending that the grand jury for the Middle District of Louisiana was improperly impaneled and constituted in violation of

the Jury Selection and Service Act[1] and the Sixth Amendment,[2] the defendants have filed motions to dismiss the original and superseding indictments.[3] For reasons which follow, the Court finds that defendants' Motions to Dismiss should be denied.

### PROCEDURAL HISTORY

The indictment in the present case was returned by Grand Jury 97–3–SP[4] on November 6, 1998. On November 12, 1998, the six defendants[5] charged in the original indictment submitted a letter to the Court which advised the Court that "[u]ndersigned counsel on behalf of the defendants in the above-captioned case are preparing and conducting preliminary factual research on a motion challenging the grand jury selection procedures in the Middle District . . . "[6] These defendants made numerous requests for information regarding the grand jury selection process in the Middle District. The Court ordered the release of the information requested by the original defendants on several occasions.[7] On December 30, 1998, these six defendants filed a Motion to Dismiss Indictment and for Evidentiary Hearing.[8]

On April 19, 1999, the Court denied the Motion to Dismiss the Indictment based on alleged violations of the Jury Selection and Service Act because the motion was not timely filed. The Court took under advisement the Sixth Amendment claim.[9]

The grand jury returned a superseding indictment on August 4, 1999,[10] which added Ecotry Fuller, a member of the Louisiana Gaming Control Board, as an additional defendant.[11] On August 5, 1999, all seven defendants joined in a Motion to Dismiss the Superseding Indictment for alleged violations of the Jury Selection and Service Act[12] and the Sixth Amendment.[13] This motion did not contain the sworn statement required under the JSSA.[14] Thereafter, on August 10, 1999 the defendants again filed their Motion to Dismiss the Superseding Indictment and attached a sworn statement.[15] The United States[16] has filed oppositions to the motions contending that there were no violations of the JSSA or the Sixth Amendment. After conducting an evidentiary hearing and oral argument on the motions, the Court took the matter under advisement.[17] For reasons which follow, the defendants' motions to dismiss the original and the superseding indictments are denied.

1. 28 U.S.C. § 1861 et seq. (1994).

2. U.S. CONST. amend. VI.

3. Rec. Doc. Nos. 64, 308, and 314.

4. Grand Jury 97–3 was designated as "Special Grand Jury 97–3" due to the nature of its investigation. It is referred to in this opinion as "97–3–SP."

5. These defendants are Edwin Edwards, Stephen Edwards, Cecil Brown, Andrew Martin, Bobby Johnson, and Gregory Tarver, sometimes referred to as "the original defendants."

6. Rec. Doc. No. 13.

7. See Orders issued November 13, 1999 (Rec. Doc. No. 14), November 19, 1998 (Rec.Doc. No. 15), and December 16, 1998 (Rec.Doc. No. 51).

8. Rec. Doc. No. 64.

9. Rec. Doc. No. 175.

10. Rec. Doc. No. 306.

11. The original defendants were again named in the superseding indictment.

12. The Jury Selection and Service Act will hereinafter be referred to as "the JSSA" or "the Act."

13. Rec. Doc. No. 308.

14. 28 U.S.C. § 1867(d).

15. Rec. Doc. No. 314.

16. The United States is sometimes referred to herein as "the Government."

17. The Court notes that the parties have had ample opportunity to brief the issues related to both the JSSA and the Sixth Amendment claims during the eight-month period from December of 1998 through August of 1999. The Court has reviewed all of the briefs.

## STIPULATIONS

On September 14, 1999, the parties entered into the following stipulations:

1. *JS–12 forms:* During the pendency of the 1993 Master Wheel and through the impanelment of Grand Juries 97–2 and 97–3, the Middle District's Clerk's Office did not maintain the "JS–12 form" or any equivalent form regarding the racial composition of the 1993 Master Wheel or the grand jury panels selected therefrom. Further, the Clerk's Office did not make any alternative efforts to monitor the racial compositions of the grand jury panels selected from the 1993 Master Wheel during the pendency of that master wheel.

2. *Selection of grand jury venires from master wheel:* During the pendency of the 1993 Master Wheel, grand jury venires were drawn directly from the master wheel through a "one-step" selection process. If former Clerk of Court Richard Martin were to testify, he would state that after discussion with the judges of the Middle District, the Middle District's Jury Plan was officially amended to include the following provision: "Pursuant to 28 U.S.C. 1878, at the option of the district court, jurors may be qualified and summoned in a single procedure, in lieu of the two separate procedures otherwise provided for by the Jury Selection and Service Act and this Plan." Mr. Martin does not believe that a specific order was given by any judge of the Middle District to implement this one-step procedure after the amended plan was adopted.

3. *Jury questionnaire follow-up procedures:* If Ms. Donna Gregory were to testify, she would state that the Clerk's Office made two separate mailings to each prospective grand juror summoned during the pendency of the 1993 Master Wheel. First, each prospective juror was sent a juror questionnaire along with a summons for grand jury duty. Second, each prospective juror was sent a reminder letter regarding the prospective juror's duty to report to the courthouse on the date of impanelment; prospective jurors who failed to return the initial jury questionnaire were also sent a second jury questionnaire along with this reminder letter.

4. *Review of returned jury questionnaires:* If Ms. Gregory were to testify, she would state that returned questionnaires from prospective grand jurors were sent directly back to the Clerk's Office, unlike the procedures employed by the Middle District in the petit jury selection process, under which jury questionnaires were sent directly to a third party data analysis company for scanning and automated analysis. Rather, in the context of grand jury selection, upon receipt of the returned questionnaires, the Clerk's Office staff reviewed them manually as part of the qualifying process; the questionnaires were not scanned by a computer at any time. Questionnaires which raised any basis for that prospective juror being disqualified or otherwise exempt from service were presented to the Chief Judge for a qualification determination. The remainder of the jurors were deemed qualified for service as grand jurors. Jurors who neglected to answer certain portions of the questionnaire, who made written comments on the questionnaire, or who attached letters or other information to the questionnaire were not disqualified or otherwise removed from the selection process for those reasons.

5. *Public notice:* The Clerk's Office did not post public notice of the selection of Grand Jury 97–3. If Ms. Gregory were to testify, she would state that the failure to post such public notice was simply an "oversight."

6. *Time interval between impanelment and order:* If Ms. Gregory were to testify, she would state that on August 29, 1997, Chief Judge Parker issued a verbal order to the Clerk's Office to impanel a second grand jury (97–3) on the afternoon of October 7, 1997. Jury

questionnaires and summonses were sent to prospective grand jurors for the 97–3 venire on August 29, 1997. The Court signed a written order for drawing Grand Jury 97–3 on October 3, 1997. Grand Jury 97–3 was impaneled on October 7, 1997. Ms. Gregory would further testify as to the facts set forth in her September 10, 1998 memorandum to former Clerk of Court Richard Martin.

7. *Transfer of jurors from Grand Jury 97–2 to Grand Jury 97–3:* If Acting Clerk of Court Lawrence Talamo were to testify, he would state that prior to the selection of Grand Jury 97–2, Chief Judge Parker, via telephone, ordered that the Clerk's Office instruct the jurors who were not randomly selected for service on Grand Jury 97–2 to remain for service on the 97–3 venire. Mr. Talamo would further testify that this was the first time that the Middle District had selected two grand juries on the same day, and that due to the nature of the investigation that Special Grand Jury 97–3 would be conducting, Judge Parker was concerned that the 97–3 panel be large enough to yield a grand jury. Thus, Judge Parker requested that the unselected jurors from the 97–2 panel be thereafter transferred to the 97–3 venire. On the morning of October 7, 1997, there were 30 prospective jurors on the 97–2 venire who were not seated as grand jurors; 25 of those individuals reported for service that afternoon on the 97–3 venire. If Ms. Janice LeBlanc were to testify, she would state that the five other jurors communicated to her that they could not stay in court during the afternoon when Grand Jury 97–3 was to be selected. She, in turn, communicated those requests for excusals to Chief Judge Parker, and that Judge Parker excused those jurors from service.[18]

## STATISTICAL DATA

In addition to the stipulations agreed to by the parties, the Court also considered other evidence which is relevant to the issues pending before the Court. A plethora of information as to the grand jury venires and the jury selection process in the Middle District of Louisiana was provided to the defendants and the United States since the original Motion to Dismiss the Indictment was filed in December of 1998. The racial composition of the grand juries empaneled in the Middle District of Louisiana is substantially different from that alleged in the defendants' motions. In response to the defendants' request for information related to the race of jurors and potential jurors who designated "unknown" for their race on the juror questionnaire, each juror questionnaire for all of the grand jury panels selected from the 1993 wheel was retrieved and race information obtained.[19] On September 3, 1999, the Court ordered a report of the statistical data which had been compiled after the Clerk's office determined the race of the jurors who designated "unknown" be filed in the record.[20] Neither the defendants nor the United States disputes the statistical data. The parties were granted the opportunity to submit supplemental briefs on the issues raised in the motions, and oral argument was held on the motions.[21] Based upon the most current statistical information filed in the record, the Court finds the statistical data relative to the racial composition of grand jury venires from the 1993 master wheel to be as follows:[22]

---

18. Rec. Doc. No. 399.

19. Rec. Doc. No. 372, p. 4 (memorandum to Lawrence Talamo from Donna Gregory).

20. Rec. Doc. No. 372.

21. See Rec. Doc. No. 372.

22. Rec. Doc. No. 372.

| Grand Jury / Date of Impanelment | Percentage of Jurors who were African–American |
|---|---|
| 93–2 (9/7/93) | 23.08% |
| 94–1 (5/3/94) | 32.31% |
| 94–2 (9/21/94) | 25.71% |
| 95–1 (5/16/95) | 28.75% |
| 95–2 (8/15/95) | 24.00% |
| 96–1 (5/21/96) | 22.40% |
| 97–1 (3/13/97) | 25.60% |
| 97–2 (10/7/97) (a.m.impanelment) | 28.80% |
| 97–3–SP (10/7/97) (p.m. impanelment) | 20.71% |

## DEFENDANTS' CONTENTIONS

Defendants assert the following violations of the JSSA regarding the grand jury selection process: (1) no JS–12 forms were maintained by the Clerk's office; (2) the grand jury pool was selected directly from the master wheel rather than from the qualified wheel, a process sometimes referred to as the "one-step process;" (3) no public notice was posted prior to selection of Grand Jury 97–3–SP; (4) Grand Jury 97–3–SP was impaneled only four days after the order for drawing the names was issued, whereas in prior instances, the time varied from 20 to 57 days; (5) the follow-up procedures utilized by the Clerk's office were insufficient; and (6) the transfer of jurors from the Grand Jury 97–2 pool to the pool for Grand Jury 97–3–SP was improper. Defendants also contend the grand jury selection procedures violated their rights under the Sixth Amendment.

## GOVERNMENT'S RESPONSE

The Government argues that the six original defendants are barred from filing a Motion to Dismiss the Superseding Indictment based on violations of the JSSA because their motion is based on the Court's prior ruling of April 19, 1999. The Government agrees that the JSSA claims brought on behalf of defendant Fuller in the Motion to Dismiss the Superseding Indictment are timely. The Government also concedes that the Sixth Amendment claims brought by all seven defendants are not barred on the basis of untimeliness.[23]

Essentially, the Government argues that the defendants have failed to show there was a "substantial failure" to comply with the requirements of the JSSA such that the random nature or objectivity of the process was affected. The Government further contends that the statistical data clearly shows that the defendants' Sixth Amendment guarantee of a right to a grand jury selected from a fair cross-section of the community was not violated by the grand jury selection process in the Middle District.[24]

## JURY SELECTION AND SERVICE ACT CLAIM

Although the Government argues that only defendant Fuller has standing to raise

---

**23.** See *United States v. Hawkins*, 566 F.2d 1006, 1014 (5th Cir.), cert. denied 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978); *United States v. Pofahl*, 990 F.2d 1456, 1466 (5th Cir.), cert. denied sub nom. *Nunn v.*

*United States*, 510 U.S. 898, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993).

**24.** *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975).

the JSSA claims, the Court will assume without deciding that all defendants have standing to raise this issue for purposes of this motion only.

█ Under the JSSA, defendants must show that there has been a **substantial failure to comply** with the provisions of the JSSA in selecting the grand jury.[25] The courts have on numerous occasions expounded upon the "substantial failure to comply" principle. "Mere 'technical' deviations from the JSSA or even a number of them" are insufficient to constitute a substantial failure to comply.[26] Rather, "a substantial violation of the JSSA will be found only when [the principles of the JSSA] are frustrated." [27] In *United States v. Bearden,*[28] the Fifth Circuit set forth the principles of the JSSA as follows:

> The legislative history states that the Act embodies two important general principles:
>
> (1) *random selection* of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of *objective criteria* only.
>
> These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.[29]

█ A substantial failure to comply with the provisions of the JSSA has also been described as "one that destroys the 'random nature or objectivity of the selection process.' "[30]

The Court will now address each of the JSSA violations asserted by the defendants.

### Failure to Maintain JS–12 Forms

█ Section 1863(a) of the JSSA requires that "[e]ach district court shall submit a report on the jury selection process within its jurisdiction to the Administrative Office . . . in such form and at such times as the Judicial Conference of the United States may specify." The parties have stipulated that these forms were not maintained by the Clerk's office. The purpose of the report "is to describe the racial, gender and ethnic composition of jury lists." [31] The report is submitted once every four years at the beginning of the new jury wheel. The failure of the Clerk's office to complete this report did not affect the randomness or objectivity of the selection process. The actual statistical data of grand jury pools noted above also confirms that African–Americans were properly included in the grand jury pool. Thus, the failure to maintain the JS–12 form did not affect the validity of the grand jury which indicted these defendants.

### No Public Notice Posted

█ Section 1866(a) of the JSSA provides that the jury commission or clerk shall "publicly draw at random" from the qualified jury wheel the number and names of persons as may be required for

**25.** 28 U.S.C. § 1867(d)(1994).

**26.** *United States v. Bearden,* 659 F.2d 590, 601 (5th Cir.1981), citing *United States v. Davis,* 546 F.2d 583, 589 (5th Cir.), cert. denied, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977), *United States v. Evans,* 526 F.2d 701, 706 (5th Cir.), cert. denied, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976).

**27.** *Bearden,* 659 F.2d at 601 (emphasis provided).

**28.** 659 F.2d at 593.

**29.** *Bearden,* 659 F.2d at 600–601, citing H.H.Rep. No. 1076, 90th Cong., 2d Sess. (1968)(emphasis provided).

**30.** *United States v. Hemmingson,* 157 F.3d 347, 358 (5th Cir.1998), citing *United States v. Kennedy,* 548 F.2d 608, 612 (5th Cir.), cert. denied 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977).

**31.** *U.S. v. Reyes,* 934 F.Supp. 553 (S.D.N.Y. 1996).

assignment to grand and petit jury panels. The JSSA defines "publicly draw" as:

> ... a drawing which is conducted within the district after reasonable public notice and which is open to the public at large under the supervision of the clerk or jury commission, except that when a drawing is made by means of electronic data processing, "publicly draw" shall mean a drawing which is conducted at a data processing center located in or out of the district, after *reasonable* public notice given in the district for which juror names are being drawn, and which is open to the public at large under such supervision of the clerk or jury commission as the Judicial Conference of the United States shall by regulation require .... [32]

The parties have stipulated that the Clerk's office did not post a public notice of the selection of Grand Jury 97–3–SP. They further stipulated that Ms. Donna Gregory would testify that the failure to post such notice was simply an "oversight." [33]

In *Bearden*,[34] a similar violation was asserted by the parties and considered by the Fifth Circuit. On most occasions, the jury clerk in *Bearden* posted the notices (one indicating the date and time of drawing and one indicating the starting number) simultaneously or only after the drawings. On one or two occasions, the clerk posted no notice at all. The failure to post the notices violated the local plan and the JSSA. However, the Fifth Circuit held that the violations did not affect the random nature or objectivity of the process. The court concluded that failure to post the

notices was the result of time pressures and was not an attempt to conceal the manner in which the clerk chose starting numbers. Therefore, the failure to post a notice was not a substantial violation of the Act. Other courts which have considered the issue have reached the same result.

In *U.S. v. Davis*,[35] the clerk had never publicly announced the time and place of the computerized drawings. The Fifth Circuit held, "[i]t will not suffice for defendant merely to show that the public-access provision was violated. Although the public-access problem constituted a technical violation of the statute, that difficulty in no way affected the random nature or objectivity of the selection process." [36] The court further found there was no evidence that the shortcoming operated to frustrate the goals of the Act. "If we had reason to believe that there were any improprieties which had escaped detection ... the result might be different." [37]

In *United States v. Rioux*,[38] the court held that the provisions of the Act requiring public notice of drawings are *technical* in nature. "Because technical violations of the Act are not a 'substantial failure' to comply with the provisions of the Act, this division's failure to ... provide public notice of drawings [does] not constitute a substantial failure to comply with the Act." [39]

Relying upon the reasoning set forth in *Bearden*, *Davis*, and *Rioux*, the Court finds that the failure of the Clerk's office to post a public notice of the selection of Grand Jury 97–3–SP was merely an isolated oversight and did not constitute a substantial failure to comply with the Act.[40]

---

32. 28 U.S.C.A. § 1869(k)(emphasis provided).

33. Rec. Doc. No. 399.

34. 659 F.2d 590 (5th Cir. Unit B 1981), cert. denied sub nom. *Browning–Ferris Industries of Georgia, Inc., et al. v. United States*, 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982).

35. 546 F.2d 583 (5th Cir.1977).

36. 546 F.2d at 589.

37. 546 F.2d at 589.

38. 930 F.Supp. 1558 (D.Conn.1995).

39. *Rioux*, 930 F.Supp. at 1582 (citing *U.S. v. Bearden*).

40. The Court must note that the Clerk's office did post a proper notice for the grand jury selected in the morning on the same day GJ–97–3–SP was selected in the afternoon.

### Empanelment Only Four Days After Order Issued for Drawing Jurors

 The parties have stipulated that on August 29, 1997, Judge Parker issued a verbal directive to Ms. Gregory to empanel Grand Jury 97–3–SP on the afternoon of October 7, 1997, but did not issue a written order to do so until October 3, 1997. Although there was ordinarily a longer lapse of time between issuance of the written order and the date of impanelment of the grand jury, the defendants failed to show that the four day time lapse in the present case affected the random nature or objectivity of the process. There is no evidence to suggest any impropriety or that "procedures were employed behind closed doors." [41]

### Selection of Grand Jury Pool Directly from Master Wheel

 Section 1878 of the JSSA provides that at the option of the district court, jurors may be summoned and qualified in a single procedure, if the court's jury selection plan so authorizes, in lieu of the two step procedure otherwise provided for by the Act. The Middle District's local plan in effect at the time GJ 97–3–SP was chosen did authorize use of the "one-step" procedure. The parties stipulated that the Middle District's Jury Plan was officially amended to authorize this procedure. Defendants have failed to show that the use of the one-step procedure affected the random nature or objectivity of the selection process.

### Transfer of Pool from Grand Jury 97–2 to 97–3–SP

 According to the stipulations, two grand juries were chosen on the same day. Because of the nature of the investigation that Grand Jury 97–3–SP would be conducting, Judge Parker requested that the unselected jurors from the Grand Jury 97–2 panel be transferred to the Grand Jury 97–3–SP venire after he had completed the selection of the Grand Jury 97–2 panel. Prior to the transfer, five of the thirty potential jurors on the 97–2 venire who were not seated as grand jurors indicated that they could not stay until the afternoon when Grand Jury 97–3–SP was to be selected and were excused. [42] Thus, 25 of the persons who were not seated as grand jurors during the morning impanelment reported for grand jury service that afternoon. These twenty five jurors were combined with the venire for the 97–3–SP venire. The members of Grand Jury 97–3–SP were selected from this combined group.

Defendants rely on *U.S. v. Kennedy* [43] in support of this alleged violation. In *Kennedy*, to satisfy a deficiency in the number of July prospects available from the qualified jury wheel, the clerk had sought *volunteers* from the list of persons serving as prospective jurors during the June term just completed, pursuant to a standing order from the chief judge. The Fifth Circuit held this was a substantial violation of the JSSA. "A volunteer is not a random selectee." Of course, the circumstances are different in the present case because volunteers were not used. The persons ordered to report for grand jury service were randomly selected. After reporting for grand jury service, they were also chosen to sit on the grand jury on a random basis.

In *U.S. v. Allen*, [44] the jury clerk needed more jurors for this case than had been on the panel. Thus, the clerk added people who had been summoned and assigned to other recently-used panels, but who had not been seated on a jury. These prospective jurors would otherwise have been thrown back in the wheel for re-summoning. Defendants argued that re-use of

41. *Davis*, 546 F.2d at 589.

42. All five of these jurors were white.

43. 548 F.2d 608 (5th Cir.1977).

44. 160 F.3d 1096 (6th Cir.1998), cert. denied, sub nom., —— U.S. ——, 119 S.Ct. 1345, 143 L.Ed.2d 508 (1999).

jurors without re-summoning them violated the random selection requirements of the JSSA. Defendants further argued that a court may not "build up" a jury pool, but must instead "summon fresh jurors for each and every trial." The court rejected this argument. According to the Sixth Circuit, "this argument reveals a fundamental misunderstanding of the process. Section 1866(c) of the JSSA specifically allows persons excluded from a particular jury to sit on another jury; thus, there is no per se problem with re-using potential jurors." [45] The court emphasized that "the JSSA specifically permits re-use of potential jurors," that each step in the process was random, and that the jurors were simply "randomly selected several times over." [46]

In the present case, "volunteer" jurors were not used at any point in the selection process. As noted earlier, the potential jurors who were to report on October 7, 1997 were randomly summoned. Jurors were then randomly chosen for service on Grand Jury 97–2. Those not randomly selected were combined with the original venire of Grand Jury 97–3–SP, who also had been randomly chosen. The actual grand jury comprising 97–3–SP was then randomly selected. Jurors for Grand Jury 97–3–SP were "randomly selected several times over." There is no evidence that this procedure in any way affected the random nature or objectivity of the process. In fact, the transfer worked to increase the percentage of African–Americans available for selection in the pool. In short, there was no substantial violation of the JSSA under the facts set forth above.

### Follow–Up Procedures as to Questionnaires

■ The procedures specified in the JSSA "include no requirement that the district court clerk take measures to cor-rect a low response rate, so long as it is high enough to generate enough names for the qualified jury wheel to enable staffing the required number of juries." [47] In *U.S. v. Gometz*, the Seventh Circuit stated as follows:

The Jury Selection Act empowers—not requires—the clerk to pursue those who fail to return their juror qualification forms: "Any person who fails to return a completed juror qualification form as instructed may be summoned by the clerk or jury commission forthwith to appear before the clerk or jury commission to fill out a juror qualification form." 28 U.S.C. § 1864(a). This power is necessary to keep the jury system from collapsing in any district where widespread noncompliance with the requirement of completing and returning the juror qualification form prevents the clerk from maintaining an adequate qualified jury wheel. But it does not follow that Congress was worried about "no shows" in cases where there was no problem filling the wheel.[48]

■ The parties have stipulated that the Clerk's office made two separate mailings to each prospective grand juror summoned during the pendency of the 1993 master wheel. The Clerk initially sent each prospective grand juror a juror questionnaire and summons. The Clerk then sent each prospective grand juror a letter reminding the juror to report to the courthouse for jury duty. Prospective grand jurors who failed to return the initial jury questionnaire were also sent a second jury questionnaire along with this reminder letter. This procedure more than satisfies the requirements of the JSSA. The defendants failed to prove that the follow-up procedures used by the Clerk's office constituted "substantial failure to comply"

**45.** 160 F.3d at 1102.

**46.** 160 F.3d at 1103.

**47.** *United States v. Gometz*, 730 F.2d 475, 480 (7th Cir.1984) (en banc).

**48.** *United States v. Gometz*, 730 F.2d at 480 (emphasis provided).

with the provisions of the JSSA such that the random nature or objectivity of the selection process was impacted.

## SUMMARY AND CONCLUSION OF JSSA CLAIM

The Court acknowledges that some mistakes were made by the Clerk's office before Grand Jury 97–3–SP was selected.[49] However, these violations taken separately or cumulatively do not constitute a substantial violation of the JSSA. Specifically, the Court finds that the random nature and objectivity of the grand jury selection process was not affected by the oversights committed by the Clerk's office.[50] This finding is supported by the statistical data showing the racial composition of the grand juries which have been empaneled by the Middle District of Louisiana.

## SIXTH AMENDMENT CLAIMS

 The Sixth Amendment guarantees a criminal defendant the right to a trial by a jury selected from a fair cross-section of the community.[51] The standard for establishing a prima facie case of violation of the fair cross-section requirement was set forth by the Supreme Court in *Duren v. Missouri*,[52] as follows:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a

"distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.[53]

Proof of all three elements listed in *Duren* is necessary to establish a prima facie case of violation of the Sixth Amendment.[54] The defendants have failed to establish a prima facie violation in this case.

### A. Distinctive Group

 There is no doubt that African–Americans are a distinctive group under *Duren*. Thus, this element required by *Duren* has been established. The Court now turns to the second prong of *Duren*—under representation of a distinctive group in venires.

### B. Substantial Under Representation

 The parties agree that 29.1% of the registered voters in the Middle District of Louisiana are African–American. The following statistical evidence regarding the racial makeup of venires from which Grand Juries 93–2 through 97–3–SP were chosen is not disputed by the parties:

---

**49.** At no time have any of the defendants alleged that the Middle District of Louisiana intentionally engaged in any acts which discriminated against African–Americans in the selection of petit or grand juries.

**50.** It is interesting to note that Edwin Edwards and five other defendants who were indicted by the same grand jury on September 24, 1999 in another case, U.S. v. Brown, CR No. 99–151–B–M2 (M.D.La.) did not file a motion to dismiss the indictment based on violations of the JSSA or the Sixth Amendment.

**51.** *Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975).

**52.** 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

**53.** 439 U.S. at 364, 99 S.Ct. at 668 (emphasis supplied).

**54.** *United States v. Allen,* 160 F.3d at 1103.

| Grand Jury | Percentage of Jurors who were African American | Absolute Disparity |
|---|---|---|
| 93–2 (9/7/93) | 23.08% | 6.02% |
| 94–1 (5/3/94) | 32.31% | +3.21% |
| 94–2 (9/21/94) | 25.71% | 3.39% |
| 95–1 (5/16/95) | 28.75% | 0.35% |
| 95–2 (8/15/95) | 24.00% | 5.10% |
| 96–1 (5/21/96) | 22.40% | 6.70% |
| 97–1 (3/13/97) | 25.60% | 3.50% |
| 97–2 (10/7/97) (a.m.impanelment) | 28.80% | 0.30% |
| 97–3–SP (10/7/97) (p.m. impanelment) | 20.71% | 8.39% |

The absolute disparity between the percentage of eligible African–American voters and their representation on the jury venires ranges from over representation by 3.21% to under-representation by 8.39%. The jurisprudence is clear. An absolute disparity of *"less* than 10%" is insufficient to satisfy the second prong of *Duren.*[55]

As noted earlier, the defendants must satisfy *each* of the three prongs to establish a prima facie case under *Duren.*[56] Because the evidence overwhelmingly shows that African–Americans were not substantially under represented in the jury venires in this district, the defendants have failed to establish a prima facie violation of the fair cross section requirement.[57] Thus, the Sixth Amendment claims are without merit.

### CONCLUSION

In summary, the defendants have failed to prove a statutory or constitutional violation in the grand jury selection process utilized by the Middle District of Louisiana. Thus, the Motions To Dismiss the Original Indictment and Superseding Indictment are hereby denied.

Therefore,

IT IS ORDERED that the Motion to Dismiss the Superseding Indictment[58] filed by defendants Edwin Edwards, Stephen Edwards, Andrew Martin, Cecil Brown, Gregory Tarver, Bobby Johnson, and Ecotry Fuller is DENIED;

**55.** See *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (the rationale of this purposeful discrimination case is often cited in subsequent cases involving Sixth Amendment fair cross section claims); *U.S. v. Butler*, 611 F.2d 1066 (5th Cir.1980). See also *U.S. v. Maskeny*, 609 F.2d 183 (5th Cir.1980); *U.S. v. Butler*, 611 F.2d 1066 (5th Cir.1980); *U.S. v. Blackburn*, 639 F.2d 1115 (5th Cir.1981); *U.S. v. Hawkins*, 661 F.2d 436 (5th Cir., Unit B 1981); *Timmel v. Phillips*, 799 F.2d 1083 (5th Cir.1986); and *U.S. v. Fike*, 82 F.3d 1315 (5th Cir.1996).

**56.** *Ford v. Seabold*, 841 F.2d 677 (6th Cir. 1988) is a good example of this principle.

**57.** The Court need not consider the third prong in *Duren*—systematic exclusion—since the defendants failed to satisfy the second.

**58.** Rec. Doc. Nos. 308, 314.