**UNITED STATES of America,**

v.

**Maria HSIA, Defendant.**

**No. CRIM. 98–0057(PLF).**

United States District Court,
District of Columbia.

Dec. 18, 2000.

John M. McEnany, Trial Attorney, Public Integrity Section, Campaign Finance Task Force, Criminal Division, Dept. of Justice, Washington, DC, for Government.

Nancy Luque, Andrew Hurst, Reed Smith Shaw & McClay, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

PAUL L. FRIEDMAN, District Judge.

Prior to trial, the Court denied a motion by defendant Maria Hsia to dismiss the indictment on grounds that the petit jury in this case was not selected in conformity with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, *et seq.* ("Jury Act"). *See United States v. Hsia,* 2000 WL 194982 (D.D.C. Feb.2, 2000). At the same time, the Court indicated that it would permit the defendant to inspect Jury Office records related to the selection of the grand jury that indicted Ms. Hsia and would allow her to renew her motion to dismiss after the conclusion of trial. On March 2, 2000, the jury convicted Ms. Hsia on all counts of a five-count indictment. After reviewing the Jury Office records related to Grand Jury 95–3, defendant has filed a renewed motion to dismiss the indictment based on the Court's alleged failure to select Grand Jury 95–3 in conformity with the Jury Act.

Defendant makes three arguments in support of her motion: (1) that the procedures employed by the Jury Office in selecting Grand Jury 95–3 resulted in a response rate so low as to result in a "volunteer" jury made up only of those who chose not to "opt out" of jury service; (2) that because the Court did not pursue enforcement proceedings with respect to jurors who failed to respond to the initial summons and questionnaire sent out by the Jury Office, it violated Section 1866(g) of the Jury Act; and (3) that the procedures employed by the Jury Office resulted in a grand jury that did not represent a fair cross-section of the community. Ms. Hsia suggests that

each of these three alleged deficiencies constitutes a "substantial failure to comply with the provisions of [the Jury Act] in selecting the grand jury," and thus requires that the indictment be dismissed. *See* 28 U.S.C. § 1867(d). Because the Court finds that there was no substantial failure to comply with the Jury Act, it denies defendant's motion to dismiss the indictment.

## I. VOLUNTEERISM

█ Defendant argues that because 60% of the persons who were originally sent questionnaires and summonses for Grand Jury 95–3 either did not respond at all, did not respond on time, or responded and then did not appear when instructed, and because the Jury Office did not take steps to force them to respond or appear, the 40% who did respond on time and did appear for jury service when instructed in effect became "volunteers," resulting in a jury panel made up only of those who chose not to "opt out" of jury service. The government responds that defendant's volunteerism argument with respect to the grand jury is no different from the one it advanced with respect to the petit jury in this case and that the Court should reject the argument just as it did the first time it was raised. *See United States v. Hsia,* 2000 WL 194982 (D.D.C. Feb.2, 2000); Transcript of January 18, 2000 Hearing ("Tr.") at 37, 42–43. The Court agrees with the government; the Court already has decided this issue and defendant has provided no good reason for the Court to change its view.

First, the non-response total (422) and the non-response rate (60%) cited by defendant are misleading. The Court sent out 700 questionnaires and summonses for potential jurors to serve on Grand Jury 95–3. Of those 700, 184 were returned as undeliverable mail, no response was received from 207, and the Jury Office received actual responses from 309. Of the 309 persons who actually responded, 23

individuals responded after the deadline, and thus responded too late to be considered part of the jury venire, and another eight responded to the questionnaire but did not appear on the date they were ordered to do so. These subsets of 23 late-responders and eight no-shows therefore can rightly be considered "non-responses" when attempting to calculate an overall non-response total and non-response rate.

It is not proper, however, to categorize the 184 undeliverable questionnaires as non-responses. To reach a non-response total of 422, defendant unfairly adds the 184 questionnaires that were returned as undeliverable mail to the 207 non-responders, the 23 late-responders and the eight no-shows. She then compares the total of these numbers (422) to the total number of questionnaires that were sent out (700) to reach a non-response rate of 60%. By including the 184 undeliverables in her calculation, defendant essentially argues that persons who do not respond because they never receive a summons and questionnaire in the mail should be counted as persons who affirmatively chose not to respond or persons who "opted-out" of jury service.

As the Court has noted previously, it is unreasonable to categorize undeliverables as persons who affirmatively opt out of jury service, particularly in such a transitory district as this one. See Tr. at 11, 37–38. A more precise non-response total and non-response rate is calculated by eliminating the undeliverables from the equation altogether. An accurate non-response total consists only of the 207 non-responders, the 23 late-responders and the eight no-shows—a total of 238 non-responses. Because the 184 undeliverables are not included in this calculation, they similarly should not be included in the total number of potential jurors to which the non-response total is compared, meaning that the 700 figure should be reduced by 184 to reach 516. When the non-response total of 238 is then compared to the 516 individuals who actually received a summons and questionnaire, the non-response rate drops considerably from the 60% figure cited by defendant to only 46%.

Second, even if the Court were to assume that every person who failed to respond was in fact delinquent without justification and was affirmatively choosing to "opt out" of jury service, the non-response rate in this case still would be much lower than non-response rates found acceptable by other courts and does not come close to constituting evidence of a "volunteer" jury pool. See, e.g., United States v. Gometz, 730 F.2d 475 (7th Cir.), cert. denied, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984) (finding that 70% non-response rate did not violate Jury Act). The Court therefore will not dismiss the indictment on the first ground offered by defendant.[1]

## II. ENFORCEMENT PROCEDURES

■ Section 1866(g) of the Jury Act provides that "[a]ny person summoned for jury service who fails to appear as directed shall be ordered by the district court to appear forthwith and show cause for his failure to comply with the summons." 28 U.S.C. § 1866(g). Defendant argues that the Court has failed to comply with the mandatory requirement of Section 1866(g) because it did not hold show cause hearings with respect to every potential juror who failed to respond to the initial sum-

1. Defendant again relies on the same inapposite cases she cited in support of her prior motion and again ignores the distinction between the truly volunteer systems condemned in those cases and the very different situation presented here. See United States v. Spriggs, 102 F.3d 1245 (D.C.Cir.1996), cert. denied, 522 U.S. 831, 118 S.Ct. 97, 139 L.Ed.2d 52 (1997); United States v. Branscome, 529 F.Supp. 556 (E.D.Va.), aff'd, 682 F.2d 484 (4th Cir.1982); United States v. Kennedy, 548 F.2d 608 (5th Cir.), cert. denied, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977). As defendant acknowledges, potential jurors in this district are never asked whether they would like to volunteer for jury duty and are never given the ability affirmatively to "opt in" or "opt out" of service.

mons and questionnaire sent out by the Jury Office.

In many districts, qualification questionnaires and summonses are mailed to prospective jurors separately in a two-step jury selection process. First, qualifying questionnaires are sent to individuals whose names are chosen randomly from a "master jury wheel" made up of all prospective jurors in that district. *See* 28 U.S.C. § 1864(a). From the questionnaires that are returned to the Court, a qualified jury pool, or "qualified jury wheel," is created. *See id.* Second, summonses are then sent to a sufficient number of persons to meet the Court's needs; those persons are randomly selected from the qualified jury wheel. *See* 28 U.S.C. § 1866(b). If an individual selected from the qualified jury wheel fails to respond to the summons, the enforcement procedures of Section 1866(g) are triggered. Section 1866—and the mandatory enforcement procedures contained in Section 1866(g) in particular—do not come into play until step two, after a qualified jury wheel has been created.

As permitted under the Section 1878 of the Jury Act, this district and 22 others employ a one-step jury selection process. *See* 28 U.S.C. § 1878(a) ("At the option of each district court, jurors may be summoned and qualified in a single procedure ... in lieu of the two separate procedures otherwise provided for [in the Jury Act].").[2] In a one-step jury selection system, when the Court requires the drawing of a grand or petit jury, names of potential jurors are drawn directly from the master jury wheel and then are sent both a questionnaire and a summons simultaneously. *See* 28 U.S.C. § 1878(a). In this system, a summons is not mailed separately to prospective jurors after the qualified jury wheel is created. Rather, because the summons accompanies the questionnaire,

the qualified jury wheel does not exist until after both have been returned.

■ In this case, no members of a qualified jury pool failed to appear after being "summoned for jury service;" indeed, summonses were not sent to anyone after the qualified jury wheel was created. The mandatory provision of Section 1866(g) therefore does not even apply in this case. Rather, because the non-responders were individuals drawn from the master jury wheel and sent questionnaires and summonses simultaneously, the governing statute is Section 1864(a) of the Jury Act, which states that "[a]ny person who fails to return a completed juror qualification form as instructed *may* be summoned by the clerk or jury commission forthwith to appear before the clerk or jury commission to fill out a juror qualification form." 28 U.S.C. § 1864(a) (emphasis added). In contrast to the language of Section 1866(g), the language of Section 1864(a) is permissive—the Jury Office *may* choose to summon potential jurors who fail to return their jury questionnaires, but it is not *required* to do so. *See United States v. Gometz,* 730 F.2d at 477–79, 482; *United States v. Santos,* 588 F.2d 1300, 1303 (9th Cir.), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *United States v. Edwards,* 72 F.Supp.2d 668, 678–79 (M.D.La.1999); *United States v. Purdy,* 946 F.Supp. 1094, 1104, 1106 (D.Conn. 1996), *aff'd,* 144 F.3d 241 (2d Cir.), *cert. denied,* 525 U.S. 1020, 119 S.Ct. 548, 142 L.Ed.2d 455 (1998). Because the Jury Act does not require the enforcement procedures invoked by defendant, a substantial violation of the Jury Act has not occurred and defendant's second ground for dismissal of the indictment therefore also must be rejected.

## III. FAIR CROSS–SECTION

Finally, defendant contends that the Jury Office's alleged practice of permitting

---

2. While jury selection conducted under a one-step process can be challenged under Section 1867, just as a two-step process may be challenged, no such a challenge "shall lie solely on the basis that a jury was selected in accordance with a one-step summoning and qualification procedure." 28 U.S.C. § 1878(b).

potential jurors voluntarily to opt out of jury service resulted in a qualified juror pool for Grand Jury 95–3 in which the District of Columbia's richest residents, its poorest residents, and its Asian–American/Pacific Islander residents were "severely underrepresented." Such underrepresentation in the qualified jury pool, defendant contends, is a substantial violation of the Jury Act and thus requires dismissal of the indictment.

■ Defendant's argument incorrectly focuses on the qualified jury pool, rather than on the source list or master jury wheel. The Jury Act requires only that the source list or master wheel—here, the list from which the Court obtained the 700 names and addresses—consists of a fair cross-section of the community. *See* 28 U.S.C. § 1863(b)(3). The Act does not entitle a defendant to have any particular group represented on her trial jury, her grand jury, or even on the venire from which the jurors from either are chosen. "It is the master jury wheel . . . which must represent a fair cross section of the community. So long as the master jury wheel is adequate and the prescribed procedure is thereafter followed, there can be no complaint that the panel ultimately produced by random selection is somehow unrepresentative in result." *United States v. Percival,* 756 F.2d 600, 615 (7th Cir. 1985). *See McCall v. Shields Associates, Inc.,* 617 F.Supp. 244, 247–48 (D.D.C.1985)

("[T]he legislative history of the Jury Act demonstrates that the statute does not contemplate challenges . . . so long as 'the initial source list [in] the selection process' produces a fair representation of the make-up of the community.").[3] Defendant has not made any allegation that the source list or master jury wheel violates this requirement of the Act. Indeed, she acknowledges that the source list was representative of a fair cross-section of the community. *See* Defendant's Motion at 2, 7. Her third ground for dismissal of the indictment therefore also must be rejected.

For all of these reasons, the Court concludes that there has not been a "substantial failure" to comply with the provisions of the Jury Selection and Procedure Act.[4] Accordingly, it is hereby

ORDERED that defendant's renewed motion to dismiss the indictment based on the Court's alleged failure to select Grand Jury 95–3 in conformity with the Jury Selection and Service Act [372–1] is DENIED.

SO ORDERED.

---

**3.** As the legislative history of the Jury Act makes plain: "If the voter lists are used and supplemented where necessary, and if the procedures outlined in the bill are otherwise rigorously followed it is no departure from the standards of the legislation that the qualified jury wheel, the venire or array, or the jury itself, may not reflect a community cross section. The Act . . . does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup." H.R.Rep. No. 1076, 90th Cong., 2d Sess. 5 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1794.

**4.** In her reply brief and at the hearing, defendant also raised the possibility that Section

1866(f) of the Jury Act might have been violated when the Jury Office used several individuals from a separate, later-qualified jury wheel to make up for an unanticipated shortage of available jurors from Grand Jury 95–3's qualified jury wheel. Section 1866(f), however, explicitly applies only to the practice of replacing petit jurors due to unanticipated shortages, not grand jurors. Nothing in the Jury Act prevents the Jury Office from randomly pulling replacement jurors from a more recently qualified jury wheel. The Jury Office's use of replacement jurors for Grand Jury 95–3 appears to have preserved the random nature and objectivity of the selection process, and thus does not violate the Jury Act.