NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0367n.06

Case No. 19-5691

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 22, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| WILLIAM ALLEN, | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| CANDICE BATTS, et al., | ) | |
|     Respondents-Appellees. | ) | |
| | ) | **O P I N I O N** |
| | ) | |

BEFORE: MOORE, McKEAGUE, and READLER, Circuit Judges.

**McKEAGUE, Circuit Judge.** William Allen appeals the district court's order denying his petition for a writ of habeas corpus. Because the Tennessee state court reviewed and denied Allen's claim on the merits, and we don't find its opinion to be an unreasonable application of clearly established federal law as it existed in 1973, we **AFFIRM**.

**I**

In 1968, a Davidson County grand jury indicted William Allen for murder. Allen moved to quash the indictment, alleging that African Americans were systematically excluded from serving on grand juries in Davidson County. The court denied his motion. And so Allen went to trial, where the jury found him guilty of first-degree murder. Allen appealed his conviction, raising multiple grounds, including the same grand jury discrimination claim. His indictment and conviction survived the appeal. *Canady v. State*, 461 S.W.2d 53, 64 (Tenn. Ct. Crim. App. 1970).

In 1971, Allen filed a state habeas petition. Again, he alleged that African Americans were systematically excluded from the grand jury that indicted him. This time, the state trial court held a full evidentiary hearing. At the hearing the county clerk and two of the three Davidson County trial judges testified. Their testimony established the method by which Davidson County selected grand jurors: the three trial judges hand-picked grand jurors from the county at large. And importantly, the system was discretionary in multiple ways. The judges apparently had unfettered discretion when selecting whom to ask to serve as grand jurors, and those who were selected were free to decline the judges' requests. At Allen's hearing, the three judges were presented with lists of the grand juries they'd selected between 1958 and 1971, and each of the judges identified which jurors were African American. Based on their testimony and other state court records, Allen contended that over that 14-year span fewer than 26 African Americans had served as grand jurors, meaning that around 5% of grand jurors were African American. Meanwhile, according to the parties' stipulation, the general population was about 20% African American.

The judges offered differing explanations for this alleged disparity. Judge Draper said any disparity was because African Americans declined to serve more frequently than Whites did. According to him, it was "very difficult" to get African Americans to agree to serve as grand jurors. Judge Cornelius said he "would guess" any disparity was caused by his knowing more Caucasians than African Americans. Both judges agreed that they tried to get a cross-section of the community and that they specifically tried to find African Americans to serve on their grand juries.

The Tennessee trial court denied Allen's habeas petition. The Tennessee Court of Appeals affirmed in 1973, finding that Allen failed to prove that Davidson County purposefully and systematically excluded African Americans from the grand jury. The Tennessee Supreme Court denied certiorari. So Allen turned to the federal system, filing a habeas petition in the district

court. Again, he was denied. He appealed to this court. And in 1974, this court affirmed, finding that substantial evidence supported the district court's decision to deny Allen's petition.

Normally, that would be the end of the story. But in 2007 Allen received a new sentence. His sentence was modified from 99 years to life in prison. Because of this new judgment, Allen was able to file another federal habeas petition in 2019, making the same grand jury discrimination claim, without it being barred as second or successive. *Allen v. Westbrooks*, 700 F. App'x 406, 409–10 (6th Cir. 2017). But after considering the merits of his petition, the district court denied it again. *Allen v. Westbrooks*, No. 3:12-cv-00242, 2019 WL 2397804 (M.D. Tenn. June 5, 2019). That brings us to this appeal.

## II

At the outset, we note that a prior Sixth Circuit panel reviewed this same claim on this same record and decided that Allen wasn't entitled to habeas relief. The state doesn't press a law-of-the-case argument on appeal or otherwise insist that we rest on the prior decision, and on that basis we are not formally barred from proceeding to the merits. But in this posture, the bar is extremely high for Allen. We ordinarily are loath to revisit a prior decision. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (saying that "as a rule courts should be loath[] to [revisit their prior decisions] in the absence of extraordinary circumstances"); *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015). Especially so, it is fair to say, when asked to do so 50 years later, when the facts and governing law have not changed. *Cf. Magwood v. Patterson*, 561 U.S. 320, 340 n.15 (2010) (noting that "[i]t will not take a court long to dispose of [repetitive] claims where the court has already analyzed the legal issues").

And that is all before we add in the constraints imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Because the Tennessee Court of Criminal Appeals considered

and denied this same claim on the merits, AEDPA applies. *See* 28 U.S.C. § 2254(d). Under AEDPA, federal courts have authority to grant habeas relief only if the state court's order was "'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)). When it comes to applying clearly established federal law, the state court needn't have foreseen which way the Supreme Court was going in the future but must only have applied a reasonable interpretation of the Supreme Court cases that then existed. *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam). This is a very difficult bar for a habeas petitioner to overcome. To succeed, Allen must prove that the Tennessee court was not only wrong in interpreting then-existing Supreme Court precedent, but that its interpretation was patently unreasonable. *Beckham v. Crews*, 515 F. App'x 355, 359 (6th Cir. 2013) (quoting *Renico v. Lett*, 559 U.S. 766 (2010)). He hasn't done that.

### A.

First, we are skeptical that, under the clearly established law in 1973, Allen established a prima facie case of grand jury discrimination. Allen maintains that he successfully made a prima facie case because he showed (1) that there was a substantial disparity between the percentage of the population that was African American and the percentage of grand jurors that were African American and (2) that the jury-selection system used in Davidson County was "susceptible to abuse."

The problem for Allen is that it wasn't until 1977—four years after the Tennessee court's decision in this case—that the Supreme Court squarely held that a petitioner could make a prima facie case by demonstrating that a substantial disparity arose from a jury-selection system that was

susceptible to abuse. *Castaneda v. Partida*, 430 U.S. 482, 494–95 (1977). Before then, the Supreme Court never said that was sufficient to make a prima facie case.

The Supreme Court did say in 1972 in *Alexander v. Louisiana* that a petitioner could set forth a viable prima facie case by showing that there was a substantial disparity and that the jury-selection system was not racially neutral. 405 U.S. 625, 630 (1972). But that doesn't help Allen, because not all systems that are susceptible to abuse are necessarily racially non-neutral under *Alexander*. Based on the facts in *Alexander* and the cases it cited for support, one could reasonably think that a system was racially non-neutral only when there was a "physical, even mechanical, aspect of the jury-selection process that could have no conceivable purpose or effect other than to enable those so disposed to discriminate against Negroes solely on the basis of their race." *Turner v. Fouche*, 396 U.S. 346, 355 n.13 (1970). In *Alexander*, the jury commissioners used jury questionnaires and juror identification cards that each designated the race of the potential juror. 405 U.S. at 630. In *Avery v. Georgia*, the first case cited by *Alexander*, the jury commissioners used color-coded cards for potential jurors—white for Caucasians and yellow for African Americans. 345 U.S. 559, 560 (1953). And in *Whitus v. Georgia*, the second case relied on by *Alexander*, the jury commissioners selected grand jurors from segregated lists of taxpayers, where African Americans were also notated with a (c) next to their name. 385 U.S. 545, 549 (1967). So, there was reason to think that *Alexander* used the phrase "not racially neutral" to describe jury-selection procedures that contained a physical step with no other apparent purpose than to facilitate discrimination. The Davidson County procedure had no such step.

The only element of the Davidson County system that Allen challenged was the room for discretion. And discretionary systems like Davidson County's had been upheld by the Supreme Court on multiple occasions. *E.g.*, *Carter v. Jury Comm'n of Greene Cty.*, 396 U.S. 320, 335–37

(1970); *Smith v. Texas*, 311 U.S. 128, 130–31 & n.5 (1940). If allowing discretion had "no conceivable purpose" other than to enable discrimination, *Turner*, 396 at 355 n.13, then the Supreme Court wouldn't have held in *Smith* that discretionary systems were "not in [themselves] unfair" and were "capable of being carried out with no racial discrimination whatsoever." 311 U.S. at 130–31. Thus, the state court could reasonably conclude that Davidson County's discretionary system was racially neutral and fell outside the rule from *Alexander*.

There were several pre-1973 Supreme Court cases where the Court disapproved the discriminatory application of discretionary jury-selection systems. But none of these cases clearly established that a prima facie case of grand jury discrimination required a showing of *only* (1) a substantial disparity and (2) the existence of a discretionary selection system that was susceptible to abuse. The cases called for something more.

In a number of the cases, the petitioner showed that African Americans were completely excluded from grand juries for an extended period of time, rather than under-represented. *E.g.*, *Hernandez v. Texas*, 347 U.S. 475, 481–82 (1954); *Pierre v. Louisiana*, 306 U.S. 354, 361 (1939). In many of the cases, the petitioner also introduced case-specific evidence suggesting purposeful exclusion. *E.g.*, *Turner v. Fouche*, 396 U.S. 346, 358 (1970) (finding it "extraordinar[y]" that 171 out of the 178 potential grand jurors culled from the jury list for lacking "uprightness" or "intelligence" were African American); *Eubanks v. Louisiana*, 356 U.S. 584, 586 (1958) (explaining that only one African American had ever served as a grand juror in the parish and that "lone exception apparently resulted from the mistaken impression that the juror was white"); *Smith*, 311 U.S. at 131 (reasoning that neither chance nor accident could explain the fact that the rare African Americans who made the potential juror list were almost invariably given a place at or near the bottom of the list, so that they rarely actually served). And in a few cases, jury

commissioners themselves attempted to justify the lack of African American grand jurors by explaining that they only selected people for jury service who they personally knew and that they simply didn't know any qualified African Americans. Yet, in those cases, there was no evidence the commissioners made any effort to become acquainted with qualified African Americans in the community. *E.g.*, *Cassell v. Texas*, 339 U.S. 282, 287–89 (1950); *Hill v. Texas*, 316 U.S. 400, 404 (1942). Thus, each of the successful petitioners presented more prima facie evidence than Allen did here.

We don't pretend that this is the only way to read the pre-1973 cases. The Tennessee court could have reasonably come to a different conclusion; they could have reasonably determined that Allen did establish a prima facie case. But if there are multiple reasonable ways to interpret precedent, and one of them supports the state court judgment from which the petitioner seeks habeas relief in federal court, then under AEDPA, we defer to the state court's decision. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011) (explaining that § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents [but] goes no further"). We can't say that the Tennessee state court was unreasonable in holding that Allen failed to make a prima facie case.

**B**

Even if Allen did make a prima facie case, the state court could reasonably find that the state successfully rebutted it. In *Alexander*, the Supreme Court explained that a state could rebut a prima facie case of systematic exclusion in jury selection "by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." 405 U.S. at 631–32. Arguably, that is just what the state did here. At the time, the judges preferred to work with grand jurors who would serve voluntarily rather than those who had to be compelled. Thus,

the judges' process was to ask people to serve on the grand jury, rather than to issue them summonses. That's a racially neutral process. And according to the state, more African Americans refused the judges' requests than Caucasians. And so, the racially neutral procedure of working with volunteers rather than conscripts created a disparity between the percentage of African Americans who served on grand juries and the percentage of African Americans in the general population.

Now, it was clearly established at the time of Allen's habeas petition that good faith affirmations were not enough to rebut a prima facie case. *Id.* at 632. And that makes sense. Actors shouldn't be able to rebut a claim of discrimination simply by saying they didn't discriminate. If a state merely insists that it never considered race when selecting grand jurors or that its officials never discriminated, that does nothing to show that there was a racially neutral reason for any disparity.

But here the state did not merely make a bare assertion that no discrimination took place. Instead, it gave a countervailing, racially neutral explanation for the disparity shown by the petitioner, namely the Davidson County judges' preference for working with volunteer grand jurors. Thus, it was distinguishable from a good faith affirmation. What's more, even if the state's explanation *sounded like* a good faith affirmation, it wasn't clear at the time the state court reviewed Allen's habeas petition that the Supreme Court's rejection of good faith affirmations covered the state's conduct here. The class of explanations that the Supreme Court called "affirmations of good faith" in *Alexander* never extended beyond the conclusory testimony from jury commissioners that they followed the law and didn't discriminate on the basis of race. *E.g.*, *id.*; *Whitus*, 385 U.S. at 551–52; *Hernandez*, 347 U.S. at 481–82; *Norris v. Alabama*, 294 U.S. 587, 598 (1935); *see also Castaneda*, 430 U.S. at 498. Thus, it was not clear whether affirmations

of good faith could encompass the statements at issue here. That distinction makes all the difference on habeas review, where AEDPA forbids us from extending the grounds for relief beyond those explicitly recognized by Supreme Court holdings. *See Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004) (holding that habeas relief from a state court judgment is appropriate only when "the necessity to apply [an] earlier rule [set forth by the Supreme Court is] beyond doubt").

We might doubt the state's explanation of its racially neutral process. We might think the state should have produced more evidence to support its explanation. But that doesn't make the state court's determination to the contrary both wrong and unreasonably wrong. *Beckham*, 515 F. App'x at 359 (quoting *Renico*, 559 U.S. 766). Especially so, since it was not clear at the time what evidence the state had to produce to substantiate any countervailing explanation. Thus, it was not clearly established that the testimony of the judges was insufficient evidence of the state's race-neutral process. Bolstering our sense that this was a reasonable determination in 1973 is the fact that the Sixth Circuit reviewed this same claim in 1974 and reached the same conclusion.

## C

The dissent brings up a few points that we should respond to. First, according to the dissent, *Alexander* said that "when a person's 'racial identification[] [is] visible on the forms used by' those selecting the grand jury, that selection process is not racially neutral because it 'provide[s] a clear and easy opportunity for racial discrimination.'" Dissent at 16 (quoting *Alexander*, 405 U.S. at 630). But *Alexander* never said that exactly. Instead, *Alexander* said that "the selection procedures themselves were not racially neutral." Period. And then, "The racial designation on both the questionnaire and the information card provided a clear and easy opportunity for racial discrimination." *Alexander*, 405 U.S. at 630. It never said that *because* there was a clear and easy opportunity for discrimination, the system was not racially neutral.

This might feel like splitting hairs. After all, it is easy to assume that *racially neutral* means the same thing as *racially blind*. But there's good reason to think the *Alexander* Court didn't see it that way. For one thing, as explained earlier, *Alexander* relied only on cases where there was a discrete step with no other purpose than to facilitate discrimination. *Id.* at 630–31; *Whitus*, 385 U.S. at 549; *Avery*, 345 U.S. at 560. There were other opinions handed down before *Alexander* in which the Supreme Court disapproved the discriminatory application of discretionary systems that were not racially blind. *E.g.*, *Smith*, 311 U.S. at 130–32. But *Alexander* didn't rely on those cases in its prima facie analysis. *Alexander*, 405 U.S. at 630–31. That's likely because the Court thought that those systems required a different analysis; it didn't think discretionary systems that created the opportunity for abuse were necessarily racially non-neutral. Further, it's valuable to remember that the purpose of a plaintiff's prima facie case is to prove inferentially that the state purposefully discriminated. *See Whitus*, 385 U.S. at 550 ("The burden is, of course, on the petitioners to prove the existence of purposeful discrimination. However, once a prima facie case is made out the burden shifts to the prosecution." (internal citation omitted)). The *Alexander* Court may have seen including a physical step in the jury-selection procedure with no other apparent purpose than to enable discrimination as more probative of purposeful discrimination than allowing decision makers discretion. Indeed, although both systems are susceptible to abuse, one is apparently *designed* to facilitate that abuse. At the very least, a state court could reasonably interpret *Alexander* this way, and under AEDPA review, that's what matters. *Shoop*, 139 S. Ct. at 506.

Second, the dissent notes correctly that "by 1973 all three judges had stopped selecting grand jurors by judicial fiat and had instead begun selecting them by random draw, a policy shift that immediately produced more equitable results." Dissent at 15. But there is still a question of what inference to draw from that fact. Yes, under the new system, the judges no longer had

unfettered discretion to select grand jurors. But also, under the new system the selected grand jurors were no longer asked if they would agree to serve. Instead, they were served subpoenas. Judge Cornelius testified that this was a "whole lot easier" than the old way, where people would frequently decline to serve, saying "they can't serve three or four months." And so the more representative grand juries may have resulted from the removal of the judge's discretion and/or it could have resulted from the removal of the grand jurors' discretion.

Last, the dissent argues that the judges at the hearing never said that the voluntary system was the reason fewer African Americans served as grand jurors. Dissent at 20. And again, the dissent is right that the judges never said it exactly in those terms. But it was clearly the import of Judge Draper's testimony:

> Q: Judge, would the absence of blacks on a number of these Grand Juries indicate that nobody suggested anybody or what? How would that come about?
> A: I tell you what it indicates to me. It is very difficult to get a black person to serve on a Grand Jury. Very difficult.
> Q: Do you recall the number . . . more difficult than it is to get a white person?
> A: Yes, sir.
> Q: Well, have you called a number of blacks who have declined to serve?
> A: Yes, sir.
> Q: Have you called a number of whites that declined to serve?
> A: Yes, sir.

During his re-direct examination, he reaffirmed his meaning when the state asked, "you have experienced a problem in getting black people to agree to spend the time it takes to be a Grand Juror?" and he answered, "That is certainly true." And again, we are joined in our interpretation by the Sixth Circuit panel that reviewed this case in 1974, which said that the "witnesses testified that they made a consistent effort to call a fair cross-section of the population with respect to age and occupation as well as race but observed a marked reluctance on the part of Negroes to serve."

**IV**

For these reasons, we **AFFIRM** the district court's denial of Allen's habeas petition.

**KAREN NELSON MOORE, Circuit Judge, dissenting**. I acknowledge that this is an unusual habeas case, one that seems flatly unmeritorious at first blush. William Allen roots his petition in a grand jury discrimination claim that both the Tennessee Court of Criminal Appeals and our court rejected decades ago, and that Allen can reassert now only because of a (wholly unrelated) new sentencing judgment he received in 2007. *See generally Magwood v. Patterson*, 561 U.S. 320 (2010). So if there ever was a case to let bygones be bygones this would be it. Scrape aside the unusual veneer, however, and one is left with a highly compelling case for habeas relief. The 1973 state-court decision rejecting Allen's grand jury discrimination claim on the merits was wrong, egregiously so in my view; Tennessee does not raise a law-of-the-case defense on appeal, or otherwise suggest that our (perfunctory and unpersuasive) 1974 ruling should guide our reasoning here; and, with both those decisions out of the picture, more recent precedent essentially dictates a ruling in Allen's favor. *See Jefferson v. Morgan*, 962 F.2d 1185 (6th Cir. 1992) (granting habeas relief to Davidson County petitioner raising virtually identical grand jury claim to that raised by Allen here). So, with respect, I must dissent.

**A.**

I begin by supplementing the majority's (generally accurate) recounting of this case's history with a few additional facts and points of context.

First, although the majority correctly observes that between 1958 and 1971 Davidson County's criminal court judges selected "fewer than 26 African Americans" to serve as grand jurors—just one was on the grand jury that indicted Allen—and that, accordingly, at least a 15 percentage point absolute discrepancy existed between the county's African-American population (20%) and the county's African-American grand juror representation (5%), Op. at 2, it bears emphasis that the odds that the judges "would have *randomly* selected" as few African-American

grand jurors as they did are "approximately 1,000,000,000 to 1." *Jefferson*, 962 F.2d at 1190 (discussing standard deviation analysis).

Second, Davidson County's grand jury selection system was not just discretionary, as the majority points out; it was opaque, too. Notably, for example, at the state-court evidentiary hearing the county's criminal court clerk testified that even *he* did not know how the three judges selected grand jurors. *See, e.g.*, R.41-21 (State Ct. Hr'g) (Page ID #3029–30) ("**Q:** And you don't know how [the grand jurors] are selected? **A:** No, sir. **Q:** Well now, Mr. Hawkins, have you heard how they're selected? **A:** Well, all I know is the Judge sends in the list of the names and the Clerk brings it in when they select the jury. **Q:** And you don't know where the Judge gets the list? You don't have any idea where the Judge gets the list? **A:** No, I have no idea.").

Third, although Judges Draper and Cornelius did testify that they "tried to find African Americans to serve on their grand juries," Op. at 2, to little-to-no avail, neither judge described any particularized effort or methodology they used to accomplish that goal—such as reaching out to African-American churches or community groups—or even cited any objective criteria they used to guide their selection process—such as work experience or community involvement. Rather, Judge Cornelius candidly acknowledged that he looked for grand jurors from within his "social connections," which, perhaps unsurprisingly, were predominantly white. R.41-21 (State Ct. Hr'g) (Page ID #3125).

Fourth, although both the state appeals court and our court (in 1974) credited the state trial court's finding that "the appointing authorities fairly and honestly endeavored to discharge their duty, and did not, in fact, discriminate or exclude members of the Negro race in their selection of the Grand Juries [between 1958 and 1971]," R.41-20 (Post-Hearing Trial Ct. Ruling) (Page ID #2990), and relied on that finding in reaching their decisions, neither court mentioned that the trial

judge overseeing Allen's evidentiary hearing (Judge Leathers) was one of the *very judges* Allen was accusing of discrimination.[1]  And yet both appeals courts deferred to that finding as if it was reached by a neutral decisionmaker.

Finally, it bears mention, by 1973 all three judges had stopped selecting grand jurors by judicial fiat and had instead begun selecting them by random draw, a policy shift that immediately produced more equitable results.  *See, e.g.*, R.41-21 (State Ct. Hr'g) (Cornelius) (Page ID #3111–13, 3122) (stating that five out of his 13 grand jurors for the 1972 term were African American, as opposed to the prior average of less-than-one per grand jury).

**B.**

With the scene set, I now turn to the law.  I agree with my colleagues' description of AEDPA deference; the statute is demanding, and we must judge state-court decisions in the context in which they arose, rather than with eye toward where the law might go in the future.  And, with this latter principle in mind, I agree that the Supreme Court precedent that should have guided the state court's reasoning is *Alexander v. Louisiana*, 405 U.S. 625 (1972).

I disagree, however, with my colleagues' conclusion that the state court reasonably applied *Alexander*, in light of the record the court had before it.  Rather, in my view, this is one of those rare instances where the state court erred so egregiously that we owe its decision no deference; instead we should review Allen's claim de novo.  *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *see also, e.g.*, *Woodfox v. Cain*, 772 F.3d 358 (5th Cir. 2014) (finding that petitioner asserting grand jury foreperson discrimination claim overcame AEDPA deference and was entitled to habeas relief).

---

[1]Davidson County's criminal court at that time consisted of just three judges:  Judges Cornelius and Draper, who testified at the hearing, and Judge Leathers, who oversaw the hearing.

**1.**

Three of *Alexander*'s holdings are relevant here.

First, "[a]lthough a defendant has no right to demand that members of his race be included on the grand jury that indicts him, . . . he is entitled [by virtue of the Fourteenth Amendment's Equal Protection Clause] to require that the State not *deliberately and systematically* deny to members of his race the right to participate as jurors in the administration of justice." *Alexander*, 405 U.S. at 628–29 (emphasis added).

Second, this kind of "deliberate and systematic" exclusion may be proven not only by evidence of total exclusion, or by direct evidence of discriminatory intent, but also by making a "prima facie" case *suggesting* discriminatory intent is afoot. And, the Court continued, an African-American defendant sets forth a viable prima facie case of discrimination when he points to (1) evidence of a "substantial disparity between the proportion of blacks chosen for [grand] jury duty and the proportion of blacks in the eligible population"—such that it is statistically improbable that the disparity arose from chance alone—alongside (2) evidence that "the selection procedures themselves were not racially neutral." *Id*. at 630. Importantly, the Court then added, when a person's "racial identification[] [is] visible on the forms used by" those selecting the grand jury, that selection process is not racially neutral because it "provide[s] a clear and easy opportunity for racial discrimination." *Id*.

Third, "[o]nce a prima facie case of invidious discrimination is established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Alexander*, 405 U.S. at 631–32. And although the Court did not make clear what a state could do to meet this burden—other than not adopt a selection system that "provided a clear and

easy opportunity for racial discrimination" in the first place—the Court did emphasize "that affirmations of good faith in making individual selections are *insufficient* to dispel a prima facie case of systematic exclusion." *Id*. at 632 (emphasis added).

**2.**

With these holdings in mind, it seems to me clear that Allen set forth a prima facie case of discrimination, and that Tennessee failed to rebut that showing in response; I struggle to see how a reasonable jurist could rule otherwise. *First*, Allen produced reliable evidence that, during the years both preceding and post-dating his indictment, a "substantial" and statistically improbable disparity existed "between the proportion of blacks chosen for [grand] jury duty and the proportion of blacks in the eligible population." *Id*. at 630. *Second*, Allen showed that, because Davidson County allowed its judges to handpick grand jurors without *any* oversight, its selection system "provided a clear and easy opportunity for racial discrimination" and therefore could not fairly be described as "racially neutral." *Id*. *Third*, the state did nothing to rebut the obvious implication of these prior two findings, *i.e.*, that African Americans were being "deliberately and systematically" excluded from Davidson County grand juries, other than to put Judges Draper and Cornelius on the stand to testify that they were not, in fact, biased, *see, e.g.*, R.41-21 (State Ct. Hr'g) (Draper) (Page ID #3100) ("I certainly did not intend to [discriminate], and if I have, it would be error of the head and not of the heart."), which was, of course, the exact response *Alexander* said was not sufficient.

The state-court decision does not sway me to the contrary. For one, rather than apply (or even acknowledge) *Alexander*—despite Allen citing the case in his brief—the state court employed amorphous equity-driven reasoning, saying it was "unwilling to place . . . stigma on" the Davidson County judges and calling Allen's showing of racial disparity "mere speculation."

R.41-24 (1973 State Ct. Ruling) (Page ID #3208). The court then conclusorily asserted that the record was "devoid of any showing of systematic exclusion of negroes from the grand jury," and that the three judges had at all times acted "discreetly, honestly, and conscientiously." *Id.* at Page ID #3208–09. The court did not once use the words "prima facie case," or discuss whether the testimony of Judges Draper and Cornelius constituted more than "affirmations of good faith." *Alexander*, 405 U.S. at 632. Nor did the court explain why Allen's disparity showing—which was based primarily on uncontradicted judicial testimony—was more "speculative" than any other grand jury discrimination case in which the Supreme Court had found a constitutional violation. *See, e.g.*, *Eubanks v. Louisiana*, 356 U.S. 584, 586 (1958) (looking to "the uncontradicted testimony of various witnesses"). The state court also appeared to rely on Judge Leathers's factual finding of "no discrimination," which, for the reasons noted above, was problematic.[2]

Tellingly, the majority does not try to defend the state court's reasoning on its own terms. Rather, the majority chooses to defend the state court's bottom-line conclusion—to deny Allen relief—with reasons of its own making. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011) (sanctioning this approach). With respect, however, I find the majority's new rationales no more convincing than the state court's old ones.

First, the majority takes aim at Allen's prima facie evidence of a "substantial disparity," observing that "[i]n a number of [] cases," the defendant presented more egregious evidence of exclusion than Allen presented here, such as evidence that a government "completely," or nearly completely, excluded African Americans from the grand jury pool. Op. at 6–7. But the cases the majority cites generally pre-dated *Alexander* by at least a decade. This matters because, by 1972,

---

[2]Indeed, the state court's reasoning was so lackluster that one member of the panel, Judge Galbreath, declined to join it, saying "there [was] a serious question as to the constitutionality of the patently subjective method used by the trial judges in Davidson County in personally choosing all members of the grand jury." R.41-24 (1973 State Ct. Ruling) (Page ID #3211). Judge Galbreath instead concurred in the judgment, for procedural reasons not at issue here.

the Court had largely moved past policing "complete exclusion" and had instead begun tackling less obvious forms of discrimination. Thus, the Court repeatedly held that a petitioner could support a prima facie case of discrimination, in part, by pointing to a large absolute percentage discrepancy between a locality's African-American population and its African-American grand jury representation. *See, e.g.*, *Whitus v. Georgia*, 385 U.S. 545, 552 (1967) (27.1% of eligible population; 9.1% of the grand jury list); *Jones v. Georgia*, 389 U.S. 24, 25 (1967) (19.7% of eligible population; 5% of grand jury list); *Sims v. Georgia*, 389 U.S. 404, 407 (1967) (24.4% of eligible population; 4.7% of grand jury list). So, on this front, Allen's prima face showing was par for the course.

Next, the majority argues that because Davidson County's grand jury selection system did not "contain[] a physical step with no other apparent purpose than to facilitate discrimination," such as color-coded tax records, the state court could reasonably have concluded that the county's system did not provide selectors with the kind of "clear and easy opportunity for racial discrimination" to which *Alexander* referred. Op. at 5; *compare with, e.g.*, *Whitus*, 385 U.S. at 548 (selection system supported prima facie case because, although jury commissioners ostensibly chose grand jurors by picking tax returns at random, in Georgia tax returns "were white for white taxpayers and yellow for Negro taxpayers"). But this conclusion makes little sense. The reason the Court was so wary of color-coded tax records was because they made a potential juror's race "visible" to the person making the selection. *Alexander*, 405 U.S. at 630. Davidson County's system allowed for that, and then some: judges couldn't just *see* a person's race when soliciting grand jurors, they could *rely on* that person's race when selecting those jurors, and none would be

the wiser. So, if anything, Davidson County's system provided even clearer and easier opportunities for discrimination than the color-code systems referenced in *Alexander*.[3]

Finally, the majority contends that, even assuming Allen made out a prima facie case, the state court could still have ruled against Allen because it was reasonable to conclude that Judges Draper and Cornelius went beyond offering "good faith affirmations" that they were not prejudiced, and instead offered "a countervailing, racially neutral explanation for the disparity shown by [Allen]." Op. at 8. And that "countervailing explanation," the majority argues, was that Davidson County's *voluntary system* was the reason fewer African Americans served as grand jurors during the relevant time period, *not* the biases of the judges selecting the grand jurors. But that simply is not what the judges said at the hearing (or, for that matter, what Tennessee has ever argued at any point in this dispute). Rather, as I noted earlier, Judge Cornelius testified that his limited "social connections" within the African-American community were the reason so few African Americans served as grand jurors, a rationale whose illegitimacy even the majority concedes. *See* Op. at 7. And although Judge Cornelius did note Davidson County's voluntary system at one point in his testimony, Judge Cornelius's point was that such a system made it difficult to convince *working* people to serve as grand jurors, *see* R.41-21 (State Ct. Hr'g) (Page ID #3114); neither he nor Judge Draper ever suggested that the county's African-American population was inherently less eager to volunteer for civic service than the county's white

---

[3]To be sure, the majority is right that, at the time of the state court's ruling, the Supreme Court had not yet analyzed a system like Davidson County's under the *Alexander* framework, and, indeed, that the Supreme Court had held that discretionary grand jury selection systems were not *per se* unconstitutional. *Cf., e.g.*, *Carter v. Jury Comm'n of Greene Cty.*, 396 U.S. 320, 335–36, 339 (1970) (holding that an Alabama statute authorizing an analogous grand jury selection scheme was not facially invalid, in response to a novel class-action lawsuit). But given *Alexander*'s clear language, and the obvious distinction between finding a system *per se* unconstitutional and finding a system sufficiently dubious to proceed past the prima facie stage of a claim, I struggle to see why further Supreme Court precedent was necessary to make the state court's patently unreasonable reading of *Alexander* reasonable. *See White v. Woodall*, 572 U.S. 415, 427 (2014) (noting that AEDPA does not "require[] an identical factual pattern before a legal rule must be applied" (citation omitted)). Indeed, it is telling that, shortly after *Alexander* was decided, Davidson County ceased using the selection method at issue.

population.[4] At bottom, then, Tennessee offered the state court just one reason to believe that the yawning disparity between Davidson County's African-American population and Davidson County's African-American grand juror population resulted from something *other than* discrimination—"good faith affirmations" of non-discriminatory intent—and that reason was *not* a legally sufficient one. *See Alexander*, 405 U.S. at 632 (collecting cases).

The state court's decision is not entitled to deference.

## C.

Of course, even if one thought the state court's decision unreasonable, and therefore not entitled to AEDPA deference, one could argue that *our* prior decision, from 1974, *is* entitled to deference, for law-of-the-case reasons if nothing else. *See United States v. Charles*, 843 F.3d 1142, 1145 (6th Cir. 2016) (noting that it is generally "indispensable that [courts] treat the same litigants in the same case the same way throughout the same dispute" (quotation omitted)). In many circumstances, this would be a compelling, if not dispositive, argument. But because Tennessee forfeited this defense by not pressing it on appeal, because our precedent suggests that the law-of-the-case doctrine does not apply in the unique "new habeas judgment" context, *see King v. Morgan*, 807 F.3d 154, 160 (6th Cir. 2015), and because the 1974 decision is a brief unpublished order lacking in persuasive reasoning I see no need for deference here.

## D.

With the cloud of prior rulings lifted, Allen's claim becomes remarkably straightforward. That is because, as I emphasized at the outset, in 1992 our court considered a virtually identical

---

[4]Judge Draper's vague remark that it was "more difficult" to convince African Americans to serve as grand jurors than white persons does not persuade me otherwise. Nothing but speculation supports the majority's assertion that the "clear[] . . . import," Op. at 11, of this remark was that African-American civic disengagement explained Davidson County's grand jury disparities, as opposed to lackluster judicial recruitment efforts rooted in discriminatory animus. This is especially so when Judge Draper's testimony is viewed in tandem with Judge Cornelius's (far more detailed) testimony.

- 21 -

grand jury discrimination claim to the one raised by Allen today—same county, same year of indictment, same grand jury system, same underlying statistical discrepancy, and same judicial "affirmations of good faith" (though this time by Judges Leathers and Draper), all in habeas no less—and granted relief. *See Jefferson v. Morgan*, 962 F.2d 1185 (6th Cir. 1992). The majority offers no reason to think *Jefferson* would not dictate the result here, were we to review Allen's claim de novo, and I can think of no good reason either. Unfortunately, though, because of circumstances outside either defendant's control—delayed state post-conviction proceedings resulted in Jefferson's habeas case reaching this court much later than Allen's habeas case, at a time when (already favorable) Supreme Court precedent had become even more defendant-friendly, *see, e.g.*, *Castaneda v. Partida*, 430 U.S. 482 (1977)—Jefferson's constitutional rights were vindicated whereas Allen's rights were (and, with the majority's blessing, now continue to be) ignored.

I respectfully dissent.